177 So.2d 355 (1965)
Welcom WATSON et al., Intervenors, and City of Fort Lauderdale, a municipal corporation of Florida, Appellants,
v.
MAYFLOWER PROPERTY, INC., a New Jersey corporation authorized to do business in the State of Florida, Appellee.
No. 5292.
District Court of Appeal of Florida. Second District.
July 14, 1965.
*356 Donald H. Norman, of Ross, Norman & Cory,, Fort Lauderdale, for appellants Welcom Watson et al., intervenors-appellants.
C. Shelby Dale, Fort Lauderdale, for appellant City of Fort Lauderdale.
Thomas O. Berryhill and Martin F. Avery, Jr., of Berryhill, Avery & Law, Fort Lauderdale, and Ellis, Spencer & Butler, Hollywood, for appellee.
SHANNON, Acting Chief Judge.
The appellee, Mayflower Property, Inc., was the plaintiff, and the City of Fort Lauderdale was the defendant in the court below. Welcom Watson et al. were intervening defendants. In its complaint Mayflower prayed:
"1. That the present zoning of Plaintiff's property imposed against the lands of Plaintiff, the subject matter of this suit, by Defendant be cancelled by Decree of this Court as clouds and encumbrances upon the Plaintiff's title thereto as unjust, arbitrary and unwarranted restrictions thereof, and therefore void and without force and effect.
"2. That Defendant, City of Fort Lauderdale, and its officers, agents, employees, and servants, in and by the Decree of this Court be forever restrained and enjoined from enforcing or attempting to enforce the R-1 single family residence zoning of Plaintiff's said property, or from interfering with or molesting the Plaintiff, and the reasonable and lawful use of its said property.
"3. That Plaintiff be protected by Decree of this Court in the continual use of its said property for its highest beneficial use consistent with the public health, public morals, safety, and general welfare, which is multiple use, including hotels, motels, and apartments."
This cause has been before this court previously in Mayflower Property, Inc. v. City of Fort Lauderdale, Fla.App.2, 1962, 137 So.2d 849. While that suit was primarily for the purpose of determining whether the plaintiff was required to pursue administrative remedies before resorting to the courts where such administrative *357 remedies would be of no avail, the opinion contains a correct description of the property involved herein. We are including as a part of this opinion a zoning map of the property involved, with surrounding territory.
The land involved is indicated on the map below in solid black.

*358 The chancellor below held that the zoning of this tract to R-1-A, thus restricting its use to single family dwellings, was arbitrary, unreasonable, and had no substantial relation to the public health, safety, or general welfare, and was unconstitutional and void. The appellants in their brief set out two points which they allege are involved, as follows:
"Did the lower court erroneously hold that the `fairly debatable' rule was inapplicable to sustain the zoning ordinance when the evidence was such that reasonable men could differ in their conclusions, and where the evidence did not conclusively demonstrate equivalent confiscation of private property interests for the benefit of adjoining landowners?"
and
"Is a zoning ordinance which permits an orderly neighborhood development according to a comprehensive zoning plan, and allows a reasonable economic use of such property while protecting adjoining landowners from the inevitable consequences of over-intensive development, invalid merely because it denies the highest economic gain to the plaintiff?"
After hearing the testimony and arguments of counsel, the chancellor in his final decree stated:
"This is a proceeding in which plaintiff alleges that the present zoning ordinances applicable to its property, which fronts on the ocean, are arbitrary and unreasonable and have no relation to the public health, safety, morals or general welfare. The action was originally brought against the City of Fort Lauderdale, however, residents in the area were permitted to intervene.
"The evidence shows that the land in question, approximately 1000 feet in length and 450 feet in width, is unimproved and lies between the Atlantic Ocean on the east and Mayan Lake on the west; it is zoned R-1-A, under which is permitted single family dwellings. It is bounded on the south by an area zoned R-4, a multiple family use, under which are permitted hotels and motels; and a hotel and several large apartment buildings, with another being planned, occupy this area. On the north the land involved is bounded by another tract, somewhat smaller, but similarly zoned; north of this second tract there is another hotel. Immediately west, across Mayan Lake, which at this point, according to plaintiff's exhibit number 8, runs from 185 to 220 feet in width, there are expensive homes.
"It was further shown that the subject land was formerly zoned for multiple family use but was changed to its present zoning in 1947 by the adoption of a master zoning plan. Since 1947 the population of the city has increased from over 36,000 in 1950 to over 83,000 in 1960, with an estimated count in 1964 of 110,000, and important physical and economic changes have taken place.
"In addition to other exhibits, a number of aerial photographs were received in evidence, and on plaintiff's exhibit number 5, the homes of the three intervenors who testified are marked by red pencil.
"It was plaintiff's position at trial that the present zoning as it relates to its property was unconstitutional, and denied to it the highest and best use of the property, the zoning having no substantial relation to the public health, welfare or safety.
"On the other hand, the intervening private property owners, principally on the west shore of Mayan Lake, maintained that the present zoning was a reasonable one, and that it was a fairly debatable question whether or not the property was adequately and reasonably usable for the purposes for which it was zoned, saying that there was a *359 high relationship between the zoning of the subject land and the health, safety and general welfare.
"As a preface, it is stated in 35 Fla. Jur., Zoning Laws, § 10, that, `The right of an owner to devote his land to any legitimate use is properly within the terms of the Constitution and the legislature may not under the guise of the police power impose unnecessary or unreasonable restrictions on that use. To be valid, a zoning ordinance must have a substantial relation to the public health, safety, morals, or general welfare. The courts usually will hold a zoning ordinance invalid when it clearly appears that the restrictions are arbitrary and unreasonable and have no substantial relation to health, safety, morals, or the general welfare.'
"In City of Miami Beach v. Lackman, Fla., (1953) 71 So.2d 148, 152, it was said that, `An ordinance may be said to be fairly debatable when for any reason it is open to dispute or controversy on grounds that make sense or point to a logical deduction that in no way involves its constitutional validity.' And in Sarasota County v. Walker, Fla., (1962) 144 So.2d 345, the statement appears that, `If the question of the validity of a zoning ordinance is fairly debatable, the court should not substitute its judgment for that of the enacting governmental agency.'
"The chief building inspector of the City of Fort Lauderdale testified that in his opinion the property was not properly zoned, and that it should be the same as the property to the south of it; that the subject land was first zoned R-1-A in 1947, but prior thereto it was an R3 area, or for multiple family use, without the height permitted today. He further testified there was no physical reason why the property could not be used for the purposes for which it was zoned. The deputy fire chief stated that there would be no difference between the property to the south and the subject property from a fire safety standpoint. And a civil engineer was of the opinion that the zoning of the property as R-1-A as compared to the R-4 zoning to the south, did not promote the public health; that the R-1-A did not hurt or help the public health in any way from the sanitation point of view.
"A realtor, witness for the plaintiff, testified that inquiries for single family ocean front property had fallen off in the last four or five years, he having had two inquiries in that time; there were two pieces of vacant property sold in 1963 and four pieces of improved single residence property, these being located in a subdivision some distance north of the tract in question.
"An appraiser-witness for the plaintiff concluded that the improvement of the property with hotels or apartments would be its highest and best use; that in this area there were no single family homes on the ocean, it being built up with hotel and apartment-type properties, and it seemed logical to expect the remaining ocean front property to be improved with conforming uses; that a fact that would seem to place additional emphasis on improving the property and other vacant properties along the beach was the marked increase in population. He further stated that the assessed value of the property in 1960, of over $136,000, had increased in 1963 to over $427,000; that apartment zoned property was worth several times the value of similarly located ocean front single family residential property. It was his opinion that there was a definite demand for ocean front apartment and hotel sites, the only other ocean front property zoned R-4 being in a subdivision to the north, Fort Lauderdale Beach. The market value of the property as R-1-A was a half a million dollars, and as R-4, two million dollars. This witness testified that if the *360 zoning were changed, it would not have any effect in his opinion upon the single family residences on the west shore of Mayan Lake because of the width of the lake; that although there would be an increase in traffic, it would not be through traffic, such as on AIA. While the property is usable for R-1-A, he believed it would be worth a great deal more if zoned R-4.
"Another appraiser was of the opinion that the R-1-A valuation was $550 to $600 per front foot, and the R-4 $1900 to $2000 a front foot; that the highest and best use for the property was for multiple unit purposes, he being influenced by the successful operation of the adjoining hotel on the south, although he agreed the land could be used for R-1-A. He did not believe that if the property were improved with high rise apartments it would have an effect on the single family homes across Mayan Lake, because, of the homes there, only three or four have a view of the ocean, which was the main value, and the subject property was largely covered with pine trees. He admitted that if the property were improved in any way, it would contribute more to noise; and that the only change had been to the south of the property.
"The president of the plaintiff corporation testified that of the original purchase price for the property, which price included other property, he attributed to the subject property about $480,000. Prior to the suit he had made efforts to have the property rezoned, without success.
"A private owner of property across Mayan Lake, whose investment in his property approximated $100,000, testifying for the defendants, stated that if high rise apartments were constructed opposite his property he could visualize not seeing the sun until close to noon; that he presumed that it would be unsightly to look across at an apartment house; if a hotel were built, it was conceivable he might have to look into the kitchen and garbage area, which would be unsightly and detract from his property; that more traffic would be brought into the area and some of it would come down the street in front of him, the area becoming loaded with residential units and hotel rooms and creating an undue burden on the city streets there now; that if there were a hotel with a night club operation, noise would be a factor; and that the lake would not adequately protect him.
"Another similar property owner (whose home, from an examination of plaintiff's exhibit 5 and defendants' exhibit 2, may be slightly south of the subject land) testified that the three or four story hotel across from him was not as bad as a sixteen story building, in that he would get more light and breeze; that he is bothered some with noise and lights; people driving by his house now throw rubbish in his yard, and more traffic would make that worse; high rise apartments would cause him `to get less side sun and air'; if he tried to cut off too much noise by plantings, the breeze would be cut off. Since 1960, three high rise apartments have been built south of him, and another is to be built, and the more that were built the more traffic they would get.
"A third resident, whose home was north of the property, testified that in her opinion if multiple family dwellings were constructed on the one thousand feet in question, the traffic would be much worse, as would the noise; that it would depreciate the area radically and she would sell her home. She testified to many changes in the general area since she had lived there.
"A real estate broker and appraiser for defendants stated that the fair market *361 value of the property, as presently zoned, was $693,000, or $828,000 as projected, his plan of projection being to divide the tract lengthwise by a 60 foot road to about 50 feet from the north line, creating nine ocean front lots on one side and nine lake front lots on the other side, this being the only location in the city having both ocean and lake frontages. The projected price of the nine ocean lots would be $623,700, and the nine lake front lots $204,600, which he rounded out to $828,000; deducting lot improvements, promotion and commissions of $135,000, he had a rounded figure of $693,000. He was convinced that the subject property was superior to others he had reviewed, and believed the lots could be sold for the valuations he had projected, it being ideal for residences of various types. If high rise apartments were built on the land, he believed the people to the west would miss seeing the ocean; they might lose some breezes, some morning sunshine, and the sunrise over the ocean. However, the property would be more valuable, if zoned as R-4.
"Another appraiser for defendants testified to disposing of the property along similar lines of subdivision as the appraiser-witness before him; he felt that there was a good steady market for ocean front lots for residential purposes. He was of the opinion nevertheless that the highest and best use of the property would be for high rise apartments.
"The court finds that the zoning ordinance, as applied to plaintiff's land, has no substantial relation to the public health, safety, or general welfare, it appearing that the restrictions of R-1-A applicable to the property are arbitrary and unreasonable.
"The land, formerly zoned for multiple family use, was purchased by plaintiff in 1956, together with acreage to the west, and was mostly undeveloped at the time. Since then many physical, economic and social changes have occurred in the area; large apartments have been built generally south of the land, and a hotel adjoins it on the south; there is another hotel somewhat north. The tract has not developed, and it is no longer practical, although it is possible, to use it for residential purposes. The population of the city has increased considerably, together with the need for available land for ocean front apartments. The highest and best use for the property is for hotels and apartments. The present zoning, which occurred in 1947, has reduced the value of the land from approximately two million dollars to a half million dollars. The zoning plan of the city will not be jeopardized or materially affected by removing the zoning restrictions. Due to the changed conditions the validity of the ordinance is not fairly debatable. It was not shown that the public health or safety would be endangered, nor was it shown that if the land remained zoned R-1-A, the property owners on the west side of the lake would retain their view across the tract, such as it is, of the ocean; or that on the thousand foot tract there could be built such a number of multiple family units as seriously to aggravate the traffic. Neither was it shown by the intervenors factually that there would be a loss to them of sunshine, light, and the variable breezes. The defendant city offered no evidence.
"In City of Miami Beach v. First Trust Co., (1949) 45 So.2d 681, it was said that, `Zoning restrictions, like other phases of the law are subject to change or removal when the reason for them ceases. When they run afoul of the public welfare appears to be a good test to direct their removal.' And in City of Miami Beach v. Lachman, *362 supra, the statement appears that, `While Village of Euclid, Ohio v. Amber Realty Company [272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016] approved the zoning and segregation of private property into residential, business, and industrial districts, it was as equally emphatic that if such zoning did not have some substantial relation to the public health, safety, morals, and general welfare, it would be held to be arbitrary, unreasonable and unconstitutional. There is no warrant whatever in this, or any other, case to support the thesis that zoning boards are infallible and that any kind of a zoning proposition they promulgate will be upheld. In other words, zoning boards are in the same category as all other administrative boards. Their ordinances and regulations will be given serious consideration and their judgments great weight, but where it is conclusively shown that they deprive one of his property without due process or otherwise infringe on State or Federal constitutional guarantees unreasonably, such ordinances and regulations cannot be said to be reasonably debatable and will be stricken down.' Also see Tollius v. City of Miami, Fla., 96 So.2d 122; City of Miami Beach v. Prevatt, Fla., 97 So.2d 473.
"The opinion of the lower court in Hillsborough County v. Twin Lakes Mobile Homes Vil., Fla., (1963) 153 So.2d 64, was affirmed wherein it was set out that, `Zoning based on esthetic consideration to preserve the beauty of a neighborhood, while making such a regulation desirable, does not in itself give vitality to such regulation.' And the court stated in Oka v. Cole, Fla., (1962) 145 So.2d 233, that `[W]e find no authority in our decisions or elsewhere to the effect * * * that vested rights can accrue to neighboring owners, * * *.'
"In consideration thereof, it is
"ORDERED, ADJUDGED and DECREED that the zoning which classifies the tract as R-1-A, restricting its use to single family dwellings, is arbitrary and unreasonable, has no substantial relation to the public health, safety, or general welfare, and is unconstitutional and void insofar as it applies to plaintiff's land."
This excellent final decree by the chancellor sets forth the entire controversy, along with findings of fact and conclusions of law with which this court is in agreement. No facts were placed in the record by the City of Fort Lauderdale, and the testimony by witnesses for the intervenors was mostly of an esthetic nature. The chancellor has come to the only conclusion with which the facts and the law agree.
Affirmed.
SMITH and ANDREWS, JJ., concur.