LANDRY, Judge.
Plaintiff (Department) takes this appeal from the judgment of the lower court awarding defendants, Mr. and Mrs. Mc-Teague, compensation in the sum of $54,-394.00 for the expropriation of defendants’ property for highway purposes. The sole question before this court is the value of the property taken and the amount of severance damages, if any, to the noncon-tiguous parcels remaining after the taking.
Subject property is situated 6 miles west of Hammond, Louisiana, in the northwest corner of the intersection of Louisiana Highway 1040 (Old Baton Rouge-Hammond Highway), which runs in an easterly-westerly direction, and Mothram or Stein Road. It fronts 256.35 feet on the north line of Highway 1040, a two-lane paved highway; its western depth is 430.27 feet; its eastern depth and frontage on Mothram Road is 386.48 feet and its rear line is 250 feet. The tract contains 2.375 acres. To the north of Highway 1040, Mothram Road is graveled, to the south of Highway 1040, Mothram Road is paved and is known as Happy Woods Road.
When taken on February 3, 1964, the property was utilized for both commercial and residential purposes. A combination grocery and service station of masonry construction, on a concrete slab, comprising 2400 square feet in area, occupied the southeast portion of the property. The building fronted Highway 1040 at the intersection above noted. Around the store an area of about 15,000 square feet had been paved for parking. Attached to or near the store was situated a trash bin and a shed to house compressors which operated a walk-in cooler utilized in the store. The residence, situated in the northwest corner of the property, set back considerably from Mothram Road, was of brick veneer constructed on a concrete slab. It consisted of two bedrooms with tile baths, modern kitchen, living room and dining room. It was variously estimated to contain from 1373 to 1505 square feet of enclosed living area. The residence had a storage shed containing approximately 166 square feet, a concrete patio embracing about 250 square feet, a porch comprising about 149 square feet and a carport consisting of approximately 288 square feet. A paved, U-shaped concrete drive approximately 10 feet in width ran from about the property line to the residence, terminating in a paved 'area 12 X 21 feet in front of the house. Near the road and across the intervening ditch the driveway was graveled. Situated near the entrance to the house was an outdoor electric light installed on a post. The premises also contained a well enclosed in a brick well house. In addition, utility lines ran from the store to the residence. The house and store were also connected with an alarm system, a stereo system and a two foot wide walk constructed of brick topped with a concrete veneer. At the time of taking the residence was approximately four years old and the commercial building three years of age. It is conceded by all appraisers that both the store and residence were constructed of prime materials by expert craftsmen. It is likewise conceded both structures had been well maintained and were in excellent condition.
All of the appraisers who testified agreed in essence that the highest and best use of subject property was its use at the time of taking. That is, the frontage along Highway 1040, to a depth of approximately 250 feet, containing the store and its appurtenances, was deemed commercial, whereas the remaining area, approximately 150 feet front on Mothram Road by the easterly-westerly depth, containing the residence, was considered residential.
From the commercial area, which comprised 1.292 acres, tract 5-14 consisting of 0.759 acres was taken. It comprised virtually the southern 14 of the entire tract and included the store, its auxiliary structures, the concrete parking area, part of the walk, the utility lines serving the store and certain other lines. There remained untaken from the commercial portion, a *266 tract containing 0.533 acres, lying immediately north of expropriated tract 5-14. The residential area encompassing 1.083 acres sustained a taking of 0.514 acres (Tract 5-13), which included part of the U-shaped driveway, the lamp post, portions of utility lines and part of the walk. The residence, untouched, remained on a parcel containing 0.569 acres fronting approximately 104 feet on what has become an auxiliary or access road to the new principal highway. The residential remainder is separated from the commercial remainder by the new connector road.
Subsequent to the expropriation, the remaining 0.533 acre tract was sold by defendant for $4,000.00 cash on October 26, 1966. The remaining house site was sold in 1967 for $17,000.00 and repurchased by defendant on February 26, 1968, for $15,-000.00.
The land and improvements taken and the value of the two remaining parcels were appraised and fixed by five witnesses, namely, Messrs. Darrel V. Willet and Edward J. Deano, testifying on behalf of the Department, and Messrs. Thomas Womack, Kermit Williams and J. Russell Doiron, who appeared for defendants. The trial court accepted the appraisal of Mr. Doiron, aggregating $54,394.00, on the ground that said witness’ analysis was well grounded and impressed the Court. Appellant contends the trial court erred in accepting Mr. Doiron’s figures because his appraisals of land values were not predicated upon the use of comparables and Mr. Doiron did not view subject property until construction was under way. Appellant also argues that the lower court erred in rejecting the appraisals of Mr. Willet, in the sum of $43,547.00, and not awarding damages in this lesser amount. Incidentally, appellant suggests the testimony of Mr. Williams may not be considered as expert testimony because the trial court neglected to recognize Mr. Williams as such.
The issues presented must be resolved in the light of certain well established rules of law. In an expropriation proceeding, the landowner bears the burden of establishing the claimed value of the property taken and the severance damages, if any, to the remainder. State of Louisiana Through Department of Highways v. Kemp, La.App., 141 So.2d 487. The measure of compensation for property expropriated for public purposes is its market value at the time of taking, not its subjective value to its owner or what the owner may have derived therefrom had the taking not occurred. Louisiana Highway Commission v. DeBouchel, 174 La. 968, 142 So. 142; Caddo Parish School Board v. Wilier, 227 La. 201, 78 So.2d 833.
In expropriation proceedings, the testimony of each expert should be considered and given effect when it appears well grounded from the standpoint of sincerity and good reasoning. Expert testimony, however, may be disregarded when it unfavorably impresses the Court. State of Louisiana Through Department of Highways v. Christ Baptist Church, La.App., 197 So.2d 83.
Market value, the price paid by a willing and informed buyer to a willing and informed vendor, is best determined by the utilization of comparable sales where com-parables are available. Reliance on criteria, such as the opinions of experts based on general knowledge and experience, is of secondary importance in determining market value when comparable sales are available. City of Alexandria v. Jones, 236 La. 612, 108 So.2d 528.
Mr. Womack, a realtor with many years experience, was recognized by the trial court as an expert on values in the Parish where subject property is situated. The witness’ testimony, however, is of little value inasmuch as he frankly admitted he based his appraisal of the property at between $80,000.00 and $90,000.00 before the taking, purely on what he believed the property was worth to its owner. He testified he was quite familiar with subject property and with the nature and extent of *267 the improvements placed thereon. Since we find, as will hereafter appear, that comparable sales existed, Mr. Womack’s testimony will be accorded little weight.
Mr. Willet inspected the property in September, 1963, prior to commencement of construction, and again in March, 1968, to verify his former appraisal. He noted that a new brick veneer home was situated in the northwest corner of the tract and that the southeast portion thereof was occupied by a combination grocery and service station. He was of the opinion that the highest and best use of the property was continuation of its combined commercial and residential use. In computing the market value of the land, he utilized the market data approach. He deemed sales of unimproved similar tracts in the vicinity the most expeditious means of determining market value because such comparables inr volved the least number of adjustments. He explained that if improved comparables were employed, additional adjustments, based on the difference between improvements, would be required. He found three comparables located at the same intersection as subject property. The comparables were situated on the southwest corner of the intersection whereas subject property was located at the northwest corner. His comparables all had their primary footage on Highway 1040 and their secondary footage on the cross road. One comparable, directly across from defendant’s property, containing 2.48 acres, sold for $13.86 per front foot; the second, a sale of 1.411 acres brought a price of $11.88 per front foot; the third being a sale of .245 acres at a unit price of $18.04 per front foot. Based on these comparables, he valued the entire property before the taking at $42.00 per front foot, or $10,767.00. He therefore valued parcel 5-13 (.759 acres) and parcel 5-14 (.514 acres) at $3,441.00 and $2,331.00, respectively, or a total of $5,-772.00 for the land actually taken.
In determining the value of the improvements, Willet used the cost approach. The building, with its components including lights and heating systems, window air conditioners and Other auxiliary apparata, he determined to have a reproduction cost value of $10.50 per square foot, or $25,-200.00. An extra allowance of $1,400.00 was made for a walk-in cooler, its compressors and other components, giving the commercial establishment a total value of $26,-600.00. The.building being three years old, Willet determined its life expectancy to be 47 years. On this basis, he depreciated the structure %oths or $1,596.00, reducing its value to $25,004.00. The concrete parking area, containing 15,275 square feet, he valued at 55 ‡ per square foot or $8,402.00. Willet valued the compressor housing, trash bin and piping taken at $200.00; the electric lamp post at $35.00; the parts of the driveway taken at $260.00; miscellaneous lines at $180.00, and the brick well house at $570.00. The sum of the commercial improvements taken were therefore valued at $34,651.00.
He then computed the value of the residence (1375 square feet) at $9.50 per square foot or $13,063.00. The appurtenances to the residence he valued as follows: Storage area, 166 square feet at $8.00 per square foot, or $1,328.00;, screen patio, 250 square feet at $5.25 per* square foot, $1,313.00; porch, 149 square feet at $3.50 per square foot, $522.00, and carport, 288 square feet at $3.50 per square foot, $1,008.00, making a total residential reproduction cost of $17,234.00. The residence, being three years old and having a life expectancy of 40 years, Willet depreciated his cost figure %oths, or 7V2%, which amounted to $1,293.-00, leaving a house cost figure of $15,941.-00. He valued the well house at $570.00, and the concrete apron, gravel drive, utility lines and light post at $1,350.00, making a total value of residential improvements in the sum of $17,861.00. His valuation of all the property before the taking was therefore $62,234.00.
His appraisal of the land improvements taken was as follows: Commercial building, $25,004.00; Concrete parking area, $8,402.-00; Trash bin and shed, $200.00; Lamp *268 post, $35.00; Driveway near residence, $260.00; Utility lines not otherwise included and rendered useless, $180.00, and Well house, $570.00, a total of $34,651.00, which added to the value of the land taken, $5,772.00, made a total of $40,423.00 for both land and improvements expropriated.
In determining severance damages, Mr. Willet utilized the following procedure. From the $62,234.00 value of the whole before the taking, he deducted the value of the land and improvements expropriated, $40,423.00, which gave a remainder value of $21,811.00. He noted that the remaining unimproved parcel subsequently sold for $4,000.00, and the residence brought $15,-000.00 in February, 1968. He deemed the severance damages to be the difference between the sum of these subsequent sales, $18,687.00, and the value of the remainder, $21,811.00, or $3,124.00. Mr. Willet did not explain why he accepted the 1968 sale price of the residence ($15,000.00) rather than its 1967 sale price ($17,000.00) as indicative of its value at the time of the taking. His estimate of defendant’s total damages was $43,547.00. He verified his findings by an income approach based on rental value.
Mr. Edward J. Deano, appearing on behalf of the Department, made an appraisal in March, 1968. He determined land values by using the market data approach. He valued the improvements by estimating reproduction costs from which depreciation was deducted. Using three comparables, a sale on August 15, 1962, of 2.009 acres at a price of $30.00 per front foot; a conveyance of 4.13 acres on July 19, 1962, for $50.00 per front foot; and a transfer in November, 1962, at a unit price of $18.00 per front foot, Deano valued subject property at $43.60 per front foot or $11,552.00 for the whole of the land. Therefore, he valued parcel 5-13 at $3,679.00 and tract 5-14 at $2,491.00, a total of $6,170.00 for all land taken. He valued the commercial building at $10.00 per square foot, or $24,-000.00, which he depreciated at 5%, which reduced its worth to $22,800.00. The walk-in cooler and its appurtenances he assessed at $1,700.00; the paving area and other miscellaneous improvements were valued at $8,250.00, a total of $32,750.00 for the improvements situated on the commercial area. The residence was appraised by Deano as follows: 1373 square feet at $10.00, $13,730.00. For other appurtenances such as carport, etc., he apparently allowed an additional $3,482.00 because he appraised the total residential ■ improvements at $17,212.00. His valuations of the whole, before the taking, was therefore $61,514.00. Mr. Deano allowed nothing for the well, the underground utilities or shrubberies as he included these items in valuing the land and improvements. He therefore estimated the value of the property taken at $38,920.00 and found no severance damages to the remainder.
J. Russell Doiron appraised the property after an inspection made in July or August, 1967. He considered some com-parables in ascertaining land values but did not rely thereon as the principal source of his appraisal. He explained that subject property was unique in the character of its development. His testimony is to the effect that the “comparables” he considered were not in fact comparables and that he virtually disregarded them in appraising the land. Instead, he relied primarily upon his experience, knowledge and judgment in fixing the value of the commercial area, 256 feet front on Highway 1040, to a depth of 250 feet, at the unit price of $50.00 per front foot, or $12,800.00. He found the reconstruction cost of the commercial structure to be $12.50 per square foot, or $30,-000.00; 13,775 square feet of adjacent parking area was appraised at 65$ per square foot, or $8,950.00. Miscellaneous improvements incidental to the business such as well and housing, walk-in cooler and culverts were appraised at $4,000.00, an aggregate of $42,950.00, which depreciated at 5% ($2,147.50) represented a value of $40,802.50, making a total of $53,602.50 for the total commercial taking. The residence site, 150 front feet, he valued at $20.00 per *269 foot, or $3,000.00. The residence and its appendages were valued at a total of $19,-111.00, including $15,050.00 for the house on the basis of 1505 square feet at $10.00 per unit, and the remainder of $4,060.00 for the carport, storage area, concrete drive and walks. His valuation of the entire property, therefore, totaled $74,844.00 before the taking. Based on the subsequent sale of the residential remainder for $17,-000.00, he concluded the severance damages to this area was $4,242.00, the difference between $21,242.00, its value as part of the whole, and the $17,000.00 for which it sold after the taking. Mr. Doiron then determined the value of the commercial area to be $3,450.00, or lA-‡ per square foot. This estimate was predicated on the 4-3-2-1 method of appraisal. This system assumes that the front 25% of a tract represents 40% of its value, the second 25% represents 30% of its worth, the third 25% represents 20% of its value and the fourth 25% represents the remaining 10% of value. After crediting the $3,450.00 value of the remaining commercial section to severance damages of $4,242.00, Doiron found severance damages of $792.00, making an aggregate loss to defendant of $54,394.00. Mr. Doiron did not consider it relevant that the commercial remainder which he valued at $3,450.00 later sold for $4,000.00. He noted that he utilized the sale price of the residence even though this transaction occurred subsequent to the sale of the commercial remainder. He explained this inconsistency by observing that negotiations for the sale of the residence commenced shortly after the taking. The import of his testimony is that the sale price of the house reflected its value at the time of the taking but that the sale of the commercial remainder did not reflect its value as of that same time.
In July or August, 1967, Kermit Williams, realtor and contractor, was engaged by defendants to appraise the property. At that time construction had been started but the commercial building, though vacated by the owner, was intact and used by the Department’s employees as a field office.
The Department attacks the weight of Mr. Williams’ testimony by pointing out that the trial court did not expressly qualify him as an expert. The record discloses that Mr. Williams is indeed an expert appraiser with many years experience. He was tendered as an expert by defendant, and it suffices to say that the failure of the lower court to recognize him as such was a mere inadvertence and oversight. Not only does the record establish his expertise as an appraiser, it shows he is entitled to the rating of an expert building contractor, and we so recognize him in both capacities.
Mr. Williams’ appraisals utilized the market data approach with regard to the land and the cost approach, reproduction cost minus depreciation, with respect to the improvements. In evaluating the land, Williams used nine comparables, all involving sales of unimproved tracts in the vicinity of subject property which were as follows: (1) Sale of 2.95 acres on January 15, 1962 for $2,017.00 per acre, located 500 feet south of subject property on Highway 1040; (2) sale of 1.37 acres on April 9, 1962 for $4,392.00 per acre, one-quarter mile from defendant’s land; (3) sale on July 19, 1962 of 4.132 acres for $3,630.00 per acre, located on south side of Highway 1040, one-fourth mile west of subject tract; (4) sale August 15, 1962 of 2.009 acres for $3,733.00 an acre, located on south side of La. 1040; (5) transfer of 1.2 acres on August 25, 1962 for $3,750.00 per acre, situated on south side of Highway 1040 a distance of 250 feet from subject property; (6) sale on September 8, 1962 of % acre at $6,000.00 per acre; (7) transfer of 14 acre on November 6, 1962, for $7,200.00 per acre; (8) transfer on March 23, 1963, of 4.59 acres, located ¡4 mile east of subject property, at $5,011.00 per acre, and (9) sale on September 16, 1963 of 7.5 acres, situated 14 mile east of subject property, at $2,-500.00 per acre. Williams conceded the comparables considered did not compare *270 directly with subject property which was a highly improved tract situated at an important intersection. Making allowances for this difference, he valued defendant’s property at $4,250.00 per acre, or $10,070.00 for the 2.375 acres involved. On this same basis, Williams valued the 1.27 acres taken at the sum of .$5,410.00.
In evaluating the improvements, Williams called upon his knowledge as a licensed building contractor with extensive experience in both residential and commercial construction. He also consulted local records for examples of recent construction contracts to determine the cost per square foot for various types of construction in the general area. Of the numerous examples thus investigated, several of the structures were personally inspected insofar as availability and access thereto was permitted under the circumstances. He additionally checked with local contractors to determine the then current per square foot cost of constructing commercial buildings. Making allowances for the variance between building costs in the Baton Rouge area, with which he was most familiar, Williams' determined the 2400 square foot commercial building to be worth $12.50 per square foot or $30,000.00. He valued the 13,775 square feet of paved parking area at 75$ per square foot or $10,330.00, on finding that it was reinforced and 6 inches in thickness. Miscellaneous items including the well, culverts, shrubs and landscaping, he found to be worth $4,500.00, giving a total reproduction cost of $44,830.00, which depreciated at 5% reduced the estimate to $42,590.00.
The residence containing 1505 square feet, Williams assigned a reproduction value of $9.50 per square foot, or $14,297.00. Carport and storage area of 385 square feet was assessed at $6.00 per square foot, or $2,310.00. Concrete walks and drive, embracing 6,120 square feet and associated with the residence, were valued at 50$ per square foot or $3,060.00. The gravel portion of the drive was appraised at $1,-150.00, making a total of $20,817.00 for all non-commercial improvements which, depreciated at 5% amounted to $19,775.00. The total of land and all improvements thus amounted to $72,435.00.
Williams then determined the total loss for property taken at $5,410.00 for land and $42,590.00 for improvements, or $48,000.00. He fixed the value of the remainder at the difference between $48,000.00 and his total valuation of $72,435.00, or $24,435.00. He determined the value of the commercial .533 acres remaining to be $2,265.00, and the residential remainder to be $17,000.00, the amount for which it initially sold after the taking. From this he deduced that the severance damages due were $5,170.-00, the difference between his remainder values of $24,435.00 and the $19,265.00 for which these remainders sold after the taking. He explained that he did not use the sale price of $4,000.00 obtained for the commercial remainder as this transfer occurred approximately two years after the taking and was therefore not indicative of value at the time of expropriation.
It is undisputed that subject property was initially appraised on the Department’s behalf by Leroy Cobb, John Lejeune and Willet. The two first named appraisers determined defendants’ damages to be $47,-163.00, which amount was originally deposited by the Department. Concededly, this deposit was subsequently reduced to $43,547.00.
Appellant contends the trial court erred in accepting Mr. Doiron’s appraisal because admittedly it was not based on com-parables which were available. It is further contended that Doiron’s land appraisal is considerably in excess of the other experts and therefore suspect. It is also claimed that the lower court erred in accepting Doiron’s evaluation of the commercial remainder at $3,450.00 when it sold for $4,000.00 after the expropriation. Appellant further contends Doiron’s estimates of improvement values should be disregarded because they were based on an income approach involving rental values, a *271 method which the law does not recognize tinder the circumstances of this case. In this regard it is argued utilization of rental values was improper because they were not based on actual market rentals. Lastly, it is contended that since Doiron’s income approach was defective, it not only failed to confirm his cost approach but established that such cost method of evaluation was defective.
Defendant-appellee has answered this appeal praying that compensation be increased to the sum of $57,087.00, based on the appraisals of Mr. Womack. Appellee also prays that the fees of the experts, Doiron, Williams and Womack, be increased to $965.44, $800.00 and $500.00, respectively, and legal interest awarded thereon from the date appellees answered plaintiff’s petition.
We believe appellant’s position is well taken regarding the weight to be given Mr. Doiron’s testimony under the circumstances. We so find because we note that comparables were available in this instance. Mr. Williams found nine com-parables as hereinafter shown. Mr. Wil-let discovered three at the same intersection as subject property. Mr. Deano noted three in the same vicinity. We find that the examples noted were in fact compara-bles due to proximity and general similarity to subject property. As such, they furnished the best and primary evidence of land value and are preferred to mere expert opinion based on experience. Granted the comparables were unimproved parcels, but each expert who testified made adjustments for this difference. As noted, some comparables were virtually abutting subject property. Under the circumstances, it was error for an appraiser to disregard them in arriving at land values. City of Alexandria v. Jones et al., 236 La. 612, 108 So.2d 528. Since the remainder of Mr. Doiron’s testimony was tainted to some degree by his failure to consider comparables, we hold that his computations are not entitled to the same weight as those of the other experts and that the trial court erred in accepting Mr. Doiron’s testimony in its entirety in awarding compensation herein.
Having rejected Mr. Doiron’s testimony for the reasons above noted, it is incumbent upon us to otherwise determine the value of defendant’s property.
In an expropriation proceeding, the testimony of each expert should be given effect when it appears to be well grounded from the standpoint of good reasoning. State of Louisiana Through Department of Highways v. Christ Baptist Church, La.App., 197 So.2d 83. We believe it follows that where the testimony of a particular expert appears singularly well founded and based on sound logic and good reasoning, the court may accept such testimony as fixing the measure of damages notwithstanding other expert testimony at variance therewith.
We are impressed with the testimony of Messrs. Willet, Deano and Williams regarding land values. Each used comparables. Beyond doubt, however, Mr. Williams’ inquiry was in considerably more depth than that of Messrs. Deano and Willet. Additionally, Mr. Williams’ land appraisal of $5,410.00 is less than Mr. Willet’s assessment of $5,772.00. We therefore accept Mr. Williams’ land valuation which is more than that of plaintiff’s expert, Mr. Deano, but less than that of plaintiff’s other expert, Mr. Willet.
We also accept Mr. Williams’ valuation of improvements because his method of determining replacement cost thereof impresses us as being more thorough and based on sounder reasons than those advanced by Messrs. Deano and Willet.
Mr. Williams went to considerable length to determine current commercial construction costs in the vicinity of subject property at the time of taking. He examined publicly recorded contracts for the construction of comparable improvements to obtain cost information. He also person *272 ally inspected some of the completed structures and additionally consulted with local contractors. To the construction cost information thus obtained, he applied his knowledge gained from years of experience in the construction business. We are likewise prone to accept Mr. Williams’ determination that the 1967 sale of the residence for $17,000.00 rather than its 1968 transfer for $15,000.00 more nearly reflects its actual value at the time of taking because the former transaction was nearer in time to the date of taking.
Because the commercial remainder sold for $4,000.00 two years after the taking does not necessarily mean its value was that amount when the expropriation occurred. Williams’ evaluation of the commercial remainder at $2,265.00 at the time of taking appears reasonable. If his valuation was correct, presumably the parcel increased in value following the taking. If such increase resulted from circumstances independent of the taking, it inures to the owner’s benefit.' If it resulted from the taking, it would be considered in diminution of severance damages. The burden was on the Department to establish that if there was such an increase, it resulted from the taking. This the Department has not done. Under the circumstances, we find no fault in Mr. Williams’ refusal to accept the sale price as the value of the commercial remainder after the taking.
Counsel for appellee urges the increases in the expert witness fees awarded his appraisers principally on the ground that appellee contracted with the witnesses for fees greater than those allowed by the trial court. Our law is settled to the effect that reasonable costs of experts testifying on behalf of a landowner in establishing the value of property taken in a condemnation proceeding, are properly taxable against the expropriating authority as costs. State Through Department of Highways v. William T. Burton Industries, Inc., La.App., 219 So.2d 837. The fixing of such costs rests within the sound discretion of trial courts. The prime elements in fixing costs of this nature are the time spent by the expert in appearing at trial and in preparatory research and investigation. An agreement on the part of a landowner to pay a stipulated fee may be received by the court as persuasive evidence only; it cannot be decisive or controlling of such issue.
We find that the trial court properly fixed Mr. Womack’s fee at $200.00 considering this witness used appraisal methods not acceptable under the circumstances.
Mr. Doiron testified that he initially spent slightly more than half a day viewing the property and later spent an undisclosed amount of time checking sales. On another occasion he visited the property with Mr. Williams and drew a preliminary draft of his appraisal. Prior to his appearance in court, he performed additional investigation and prepared his final report. Based on Mr. Doiron’s preparatory time and appearance in court standing alone, we would be inclined to the view that the trial court erred in fixing his fee at only $200.00. However, considering we find his testimony of little value in this instance because of his failure to utilize available comparables, we think the award of the trial court is reasonable.
We feel, however, the trial court erred in fixing Mr. Williams’ fee at $200.-00 instead of $800.00 as prayed for by defendant. Williams testified he spent approximately 12 to 14 full days in preparing his appraisals, including the formulation of his report. He stated his fee for services rendered to defendant totaled $800.00, including his appearance in court. It suffices to state that in view of Williams’ thoroughness and unusual diligence, we consider this sum reasonable.
Appellee’s claim of interest on the fees awarded his expert witnesses must be denied. Expert witness’ fees are taxable as costs, not damages. Interest is not *273 recoverable on costs. DeLizardi v. Hard-away, 8 Rob. 20.
It is ordered, adjudged and decreed that the judgment of the trial court be amended to reduce the award of damages in favor of defendants Hilarión McTeague and Ruby McTeague from $54,394.00 to $53,-170.00, together with interest on the sum of $9,623.00 from February 4, 1964, until paid.
It is further ordered, adjudged and decreed that the expert witness fee of Kermit Williams be fixed at $800.00 and taxed as costs, and that except as herein specifically amended, the judgment is affirmed.
It is further ordered, adjudged and decreed that the State of Louisiana, Through the Department of Highways, be cast for all costs to which it is amenable at law, all remaining costs to be paid by defendants Hilarión McTeague and Ruby Mc-Teague.
Amended and rendered.