257 So.2d 563 (1972)
The CITY OF MIAMI, a Municipal Corporation, Appellant,
v.
Sam I. SILVER et al., Appellees.
No. 71-133.
District Court of Appeal of Florida, Third District.
January 11, 1972.
Rehearing Denied January 24, 1972.
*564 Alan H. Rothstein, City Atty., Horton, Schwartz & Perse, Miami, for appellant.
Sibley, Giblin, Levenson & Ward, Miami Beach, John R. Farrell, Miami, for appellees.
John G. Immer, Miami for Coconut Grove Civic Club, amicus curiae.
Beckham & McAliley, and William Huggett, Miami, for Tigertail Ass'n, amicus curiae.
Adams, George & Wood, Miami, for Citizens League, amicus curiae.
Richard L. Lapidus, Miami, for Tropical Audubon Soc., amicus curiae.
Before PEARSON, CHARLES CARROLL and HENDRY, JJ.
PEARSON, Judge.
The City of Miami appeals from a final judgment which holds:
"1. The present R-1, single family residential zoning restrictions on the Plaintiffs' property bears no relationship whatsoever between the need for zoning restriction and the public health, safety, morals or general welfare.
"2. The present R-1, single family residential zoning use limitation and restriction upon the subject property is ill-founded, unreasonable, and arbitrary to the point of confiscation, and as applied to the Plaintiffs' property said zoning restrictions are invalid and unconstitutional.
"3. The Court finds, determines and orders that no zoning restriction or use limitation be imposed or applied to the Plaintiffs' property which will restrict or limit its use to any greater degree, extent or utility than R-5 zoning restrictions under and pursuant to presently existing City of Miami zoning ordinances."
The trial judge has fully set forth the factual basis for his decision:
"The Plaintiffs are owners of a tract of unimproved bayfront property consisting of nearly five acres situate in the City of Miami. The property abuts South Bayshore Drive at the approximate foot of Kirk Street in Coconut Grove, and runs easterly from South Bayshore Drive to Biscayne Bay.
"The subject property first became zoned single family residential by the City of Miami in 1937 when, by the same comprehensive zoning ordinance, the City of Miami zoned virtually every foot of bayfront property from the Miami River to Dinner Key as single family residential (R-1).
"North of the subject property is Rockerman Canal, which runs from Biscayne Bay to South Bayshore Drive, and which, unbridged, establishes a natural line of demarcation between the single family zoning in which the subject property lies, and other, more remote single family zoning lying northeast of Rockerman Canal. Situate on the north side of Rockerman Canal is a small, single street subdivision, only half improved notwithstanding its platted presence for almost seventeen years. Nevertheless, Rockerman Road is the nearest bay-oriented single family zoned properties which have actually been built upon in recent years. There was evidence of some multiple family apartment use in fact occurring in this single family zoned area.
"Coral Reef Yacht Club, zoned waterfront recreational (W-R), less than 600 feet southwest of the subject property, likewise abuts the easterly boundary of South Bayshore Drive, and extends to the waters of the Bay. The evidence disclosed that existing W-R zoning classification upon the Coral Reef Yacht Club properties had been changed from *565 its original 1937 R-1 single family classification and use a number of years previously.[1]
"[1] Uses permitted under W-R zoning include, inter-alia,
`(1) Boat Docks, Slips, Piers, Wharves, Anchorage and Moorages for Yachts and Pleasure Boats.
(2) Yacht Clubs.
(3) Boat Rentals, Boat Livery, and Boats for Hire.
(4) Boat and Marine Motor, Sales and Display, Yacht Broker, Marine Insurance Broker.
(5) Boat and Marine Motor, Service and Repair while boats are in the water.
(6) Retail sale of boating, fishing, diving and bathing supplies and equipment.
(7) Restaurants and refreshment stands.
(8) Seaplane Base, Dirigible Base, Heliports.
* * * [etc]'
"It is noted that between the subject property and Rockerman Canal on the north and Coral Reef Yacht Club to the south, lies large City tracts recently acquired by purchase, and thereafter recently rezoned by the City from single family to a P-R classification.[2]
"[2] The uses permitted under P-R zoning appear to be unlimited. At all events, there are no express prohibited uses."
"Since approximately 1960 the City of Miami has apparently planned to acquire the subject property by condemnation or otherwise, as an integral part of a proposed expansion and extension of existing Dinner Key waterfront and marina facilities from existing locale, northerly to Rockerman Canal.
"Modern sewer facilities were installed and became operative in the immediate area of the subject property by at least April, 1969.
"The evidence disclosed that as early as 1961, incident to implementation of a comprehensive overall zoning study, the City's own Planning and Zoning Board recommended that the single family residential district in which the Plaintiffs' tract is located, be rezoned to a multiple residential use classification.
The trial court found that single family residential zoning upon plaintiff's property was grossly unreasonable. The court further found that recent zoning changes had so changed the area that R-1 zoning was no longer a constitutional application of the zoning power. In addition, the court made the specific finding that the city's restrictive zoning was adhered to for the "obvious purpose of its ultimate acquisition at as low a price as possible."[1]
The property is bounded on two sides by South Bayshore Drive and Biscayne Bay. The tracts on the other sides, although zoned R-1 at the present, are within an area designated by the city for future park and recreational use and in fact contain some areas already purchased by the city and rezoned P-R.
The City of Miami in its appellant's brief has presented a single point on appeal in which it urges that the record does not support the trial court's conclusion that the R-1 zoning classification is invalid, but on the contrary, that the ordinance in question as applied to appellees' property is fairly debatable. In its argument, the city under *566 several subheadings urges: a) that the record fails to show a deprivation of reasonable use, b) that the record fails to show an unnecessary and unreasonable invasion of appellees' property rights, c) that the court improperly considered the city's change of zoning of its own property because the city is not subject to zoning restrictions, and d) the record does not support the conclusion of the trial court that the motive of the City of Miami in retaining single family zoning was to procure appellees' property at a minimum cost. In addition, we have the benefit of several briefs of amicus curiae. Each of these briefs urge that the interests of the people of this area can best be served by preserving this tract for the ultimate acquisition by the city for public park purposes.
While we are not unsympathetic to the acquisition of land in our crowded cities for public park purposes, we do not think that we are privileged to bend the law or to disregard the findings of the trial judge upon the evidence before him in order to accomplish a public purpose which, if we understand the argument presented, would enable the city to acquire the subject property by payment of less than its true value.
Because appellant's point on appeal urges that the evidence is insufficient to support the findings of the trial judge it is necessary for this court to examine the entire record in the light of the briefs. This examination reveals that this case was fully tried by able counsel. The record contains several hundred pages of testimony and depositions. Because of the nature of the case a great deal of the testimony was by expert witnesses. These witnesses, whose qualifications as real estate experts were accepted by the court, in our opinion, amply support the conclusion reached by the trial judge. It would be exhausting both to the writer and to the reader to present here a witness by witness analysis of the testimony presented to the trial court. Therefore, we will not undertake that task. A brief summary of some of the evidence which we think supports the conclusion reached by the trial judge is as follows. The appellee as plaintiff presented the testimony of W. Bates Cole whose qualifications as a real estate expert were stipulated to by the city. Mr. Cole testified: "I feel the [subject] property is entirely unsuited for R-1 construction," and that, as R-1 zoned "the property as a practical matter, it could not be used." Mr. Cole also testified that his personal examination of the area disclosed considerable multiple family-apartment usage in the immediately surrounding R-1 areas, together with other indications such as a number of for-sale signs reflecting substantial transition of the area surrounding the subject property to non-single family use. In addition, Mr. Cole pointed out that the subject property lies within an area extending from Rockerman Canal on the north to Coral Reef Yacht Club on the south, all lying east of South Bayshore Drive; that, this last above described area had been zoned R-1 since 1937; that, nevertheless, no single family residential development had taken place within that area of the subject property over these several decades. He also noted that the Everglades School, located just north of Rockerman Canal on the west side of South Bayshore Drive (together with its tennis courts, parking areas and athletic field located on the east side of South Bayshore Drive), was de facto use which is not permitted under R-1 zoning classification.
Appellees' position that the property was not usable in its present R-1 classification was also advanced by the testimony of Mr. Fred Ridolph who is also stipulated by the appellant to be qualified as an expert. Mr. Ridolph's testimony was that the property was presently unusable for single-family units and that because of the location of the property and the uses surrounding it a change to multiple-family zoning would not constitute spot-zoning. Of course the city countered with the testimony of its own expert witnesses. Ordinarily the weight to be given expert testimony is for the trier of fact, Hawkins v. Schofman, Fla.App. *567 1967, 204 So.2d 336. We are unable to say from a review of the totality of the testimony before the trial court that he applied a wrong rule of law or that he misapprehended the weight of the testimony or the significance of the physical facts concerning the subject property.
We turn now to appellant's contention that the trial court erred in concluding that the motive of the City of Miami in retaining single-family zoning was to procure appellees' property at a lower price. We note now that an error in this finding would not necessarily result in reversal of the judgment appealed. If the trial court correctly determined that the R-1 zoning is "unreasonable and arbitrary to the point of confiscation and as applied to plaintiffs' property  invalid and unconstitutional" then the holding as to the equitable estoppel of the city to resist a higher classification is only ancillary to the trial court's basic finding.
In Board of Commissioners of State Institutions v. Tallahassee Bank and Trust Co., Fla.App. 1958, 108 So.2d 74, the District Court recognized the general rule that courts will not explore the motives of a legislative body in promulgating zoning classifications. Nevertheless, the court held in that case that the City of Tallahassee through the exercise of its zoning powers, restricted the use of property in the Capitol Center area in cooperation with the State Government, so that the state, when it came time to acquire the property through the exercise of the power of eminent domain, could do so at a cheaper price. The District Court further held that this was an improper exercise of the zoning power and in so doing stated:
"Even when adorned with a mantle of civic improvement we cannot conceive of a policy of government afflicted with greater potentials for abuse of the private citizen. The only difficulty with the desires of all of the officials as well as the effort which they put forth to effectuate their wishes, simply was that out of their ambition to construct an attractive Capitol Center that would be a credit to all of Florida they imposed upon certain private property owners in the involved area the burden of suffering what amounted to an arbitrary and unreasonable restraint on the use of their property."
We think that the evidence in this record that the City of Miami has over a period of years consistently resisted the attempt to change the zoning classification on this property while at the same time publicly announcing its intention to acquire the property for uses beyond the present zoning lends support to the trial judge's conclusion. Long v. City of Highland Park, 329 Mich. 146, 45 N.W.2d 10 (1950); State ex rel. Tingley v. Gurda, 209 Wis. 63, 243 N.W. 317 (1932); 1 R. Anderson, American Law of Zoning § 7.32 (1968).
On March 14, 1966, the City passed Resolution No. 37550, stating that on September 29, 1964, the electorate of the City of Miami approved the issuance of general obligation bonds to defray the cost of acquiring the subject property and neighboring properties for the expansion of the "Dinner Key Waterfront Recreational facilities." On September 24, 1965, the appellees were notified by a formal letter from the City of Miami of the city's intention to acquire the subject property for the expansion of the "Miami Dinner Key Marina-Park facilities." Mr. Sam I. Silver, one of the owners of the subject property, testified that after receipt of the letter of September 24, 1965, attempts were made to negotiate with the city but were fruitless, and that during the entire period of time the zoning application was held up and delayed. Finally on March 28, 1968, the city denied the appellees' application for rezoning. That resolution is numbered 39525. The very next numbered resolution of the City of Miami, namely, Resolution No. 39526 dated the very same day as the denial of the appellees' application for rezoning (March 28, 1968), authorized and directed the City Manager and the City Attorney to *568 negotiate for the purchase of the subject property. Silver testified, that after having met with total frustration and constant delays, the city finally denied the application for rezoning and instantaneously passed the resolution authorizing the City Manager to negotiate to buy the property. The instant law suit was filed on May 28, 1968, and after that the parties still had further discussions and negotiations regarding the city's acquisition of the subject property. On December 11, 1969, the city passed Resolution No. 41182 authorizing the condemnation of the subject property and neighboring properties for "additional Marina facilities." Silver testified that the condemnation suit, to take the subject property and the neighboring properties for the "purpose of providing additional marina facilities," was filed and served in July, 1970.
The appellant relies upon the case of Donch v. City of Miami, Fla.App. 1968, 214 So.2d 503 for reversal.[2] We agree with the trial court's determination that the holding in the Donch case is not governing under the facts of this case. First, there are the physical and geographic facts that the Donch property is located a considerable distance to the north and across Rockerman Canal and well beyond the area where the city has changed the zoning for its proposed public purposes. Second, we think the evidence in this case that the subject property is completely unusable for single-family dwellings makes the holding in Donch inapplicable here. See Tollius v. City of Miami, Fla. 1957, 96 So.2d 122.
Upon the motion of the appellant, city, this appeal was advanced for oral argument. The motion sets forth the city's pending action to acquire the subject property by proceedings in eminent domain. In order to effect the purposes set forth, we limit the time for the filing of petitions for rehearing to five days from the filing of this opinion.
Because of the views expressed, the judgment of the trial court is affirmed.
Affirmed.
CHARLES CARROLL, Judge (dissenting).
With due deference to my colleagues on this case I am impelled to dissent. I respectfully submit that the judgment of the *569 trial court, which held that the ordinance of the City of Miami by which this area of the city is zoned for single residential use is invalid as to the particular parcel owned by plaintiffs and held that plaintiffs' parcel should be rezoned to a classification which would permit construction of high rise apartments thereon, should be reversed.
The subject property, comprising five acres, located between South Bayshore Drive and Biscayne Bay, some distance north of Dinner Key, lies in the midst of an extensive area zoned R-1 for single residences. A copy, reduced in size, of a map of the area which was filed in evidence is here set out.

The large numbers appearing on the above map were placed thereon for convenience in making references to various parcels. No. 6 on the map denotes the subject property. For a park planned to be created by the city, to consist of parcels numbered four through eight, the city already has acquired, and has designated for park purposes, parcels numbered four and eight, and there is pending an action by the City of Miami for condemnation of the intervening parcels five, six and seven to complete the park. The length of this park area, along Bayshore Drive, is to be approximately *570 1,600 feet, and along the line of the bay front approximately 1,400 feet. As revealed by the map, the subject property lies near the center of such planned park area. According to an aerial photograph which is in evidence, the bay side limits of parcels seven and eight have been extended by filling, as indicated by the dotted line on the map. On parcel nine, north of Bayshore Drive, there is located a private school for girls. A portion of parcel nine lying south of Bayshore Drive is in use by the school for athletic purposes (tennis courts). Parcel No. 10 is the undeveloped ten acre tract that was involved in the Donch case (Donch v. City of Miami, Fla.App. 1968, 214 So.2d 503), in which this court upheld a judgment approving legislative action of the City of Miami in denying an application of the owners of a nearby bay front parcel to amend the zoning ordinance to similarly liberalize the zoning thereof.
I consider the majority decision affirming the judgment of the trial court to be wrong in several respects and for a number of reasons. First, the decision sanctions the action of the trial court in substituting its judgment for that of the legislative body of the City of Miami on a matter of zoning which was fairly debatable, in conflict with authority holding such to be improper.[1] Secondly, because the decision approves a judgment creating spot zoning, which is a practice that is universally condemned.[2] Witnesses for plaintiffs said the change would not constitute spot zoning. Witnesses for the city said that it would. This court in Donch held a similar change of zoning of a nearby parcel would be spot zoning.
Thirdly, by proceeding on the theory that the judgment should be affirmed if there was presented some competent substantial evidence (by testimony of plaintiffs' hired experts) in support of plaintiffs' contention that the existing zoning on the subject parcel was improper, the majority decision failed to give due effect to the presumption of validity of the ordinance and to the rule that one who challenges the validity of a municipal zoning ordinance carries an extraordinary burden to prove its invalidity.[3] That burden is not carried when, as here, evidence pro and con on the question is balanced or in substantial conflict.
Fourthly, by disregarding the holdings of this court in the recent Donch case (214 So.2d 503) involving a substantially similar situation with reference to a nearby bay front parcel, which were that the matter of its zoning was fairly debatable and that to rezone the parcel for multifamily uses would be spot zoning (unless the zoning was changed for the entire area), without renouncing and receding from those holdings of this court in Donch, the majority has rendered a decision opposite to the earlier one wherein reasonable basis for distinction does not appear[4]  a practice that *571 is not calculated to promote confidence in reliability of the judicial process.
Fifth. One of the main grounds listed in the majority opinion as those upon which the judgment of the trial court was bottomed, was the determination, upon questioning the motives of the legislation relating to this zoning, that by retaining the long standing single residence zoning through denying an application of the landowner to rezone this parcel to permit high rise apartments, the legislative body of the city had acted with an improper motive of seeking to avoid added expense in acquisition of the property upon condemnation.
In dealing with that feature the majority opinion made reference to the rule of law that the motives of a legislative body are not to be questioned by the courts upon consideration of its legislative action, but in derogation thereof proceeded to consider and discuss at some length the question of whether the trial court's determination as to motive of the city therein was supported by the record, and expressed the conclusion that it was; adding that if that determination of the trial court as to improper motive was erroneous it should not be a ground for reversal of the judgment but should be regarded as a holding that was "only ancillary" to the trial court's determination of invalidity of the ordinance. As to the latter I cannot agree. Since the conclusion reached by the trial court regarding motive was one of the several main grounds upon the judgment rested, the extent of its influence upon the trial court's decision cannot be gauged or determined.
In questioning the motives of the legislative body of the city in this connection the trial court was clearly in error, and in my view the majority is in error in entertaining and sanctioning such inquiry into the motives of the legislation involved. The law that such motives of a legislative body are not subject to inquiry by the courts is firmly established.[5] The trial court's finding or conclusion of improper motive in the zoning legislation in question should have been summarily rejected by this court. Since it is evident that the judgment was based thereon, or was entitled to be largely influenced by the trial court's improper inquiry into and determination as to motive, it should have been reversed for that reason; or at the least the cause should have been remanded to the trial court for redetermination, excluding from consideration any question of motive of the *572 legislative body in respect to the legislation involved.[6]
The Tallahassee case (Board of Com'rs of State Inst. v. Tallahassee B. & T. Co., Fla.App. 1959, 108 So.2d 74) presented an exceptional situation on the matter of motive. There the state, through the above named agency, was proceeding in eminent domain to acquire certain properties in the area known as the Capitol Center, in close proximity to the Capitol Building and other state buildings, for the purpose of enlargement and development of the Capitol Center. It was conclusively established by defendant landowners, without any evidence to the contrary being presented by the state, that through a collusive contract between the state agency involved and the city (the court referring thereto as a contract between them through "purposeful collaboration"), in order to benefit the state in the eminent domain proceedings, the city had imposed certain use limitations on the properties which were less liberal than uses for which the properties should have been zoned in that area, where they were encompassed by state buildings and other properties having more liberal uses.
In that case the first district court of appeal recognized the rule that motives of a legislative body are not subject to judicial inquiry, and neither the trial court nor the appellate court held or declared the zoning ordinances involved to be invalid. In the circumstances presented, the appellate court held the trial court did not commit error when it permitted the landowners to present evidence of the value of their properties based on the highest and best uses thereof, and that the evidence in the eminent domain proceeding need not be limited to opinions of the values thereof for the limited uses for which actually so zoned.
From that case as reported it is not clear whether the district court held that the value for higher and better uses than those called for by the zoning could be shown only because of the established collusive action of the state and city whereby the city had unduly imposed use restrictions on the properties, or that the decision stands for the proposition that in an eminent domain case, without invalidating an existing zoning ordinance, a landowner can present evidence of value of his property for higher and better uses than those for which it is zoned if he is in a position to show that the uses for which it is zoned impose unreasonable use restraints thereon and shows that the situation relating thereto is such as to indicate reasonable probability that the property would be rezoned for more liberal uses within a foreseeable time. That the latter was the scope and intent of the holding of the district court can be argued with much force, predicated upon the statement by the court there as follows (108 So.2d at 81-82):
"* * * As we shall see, there are numerous authorities to support the position of the trial judge. In the ultimate he merely held that in a condemnation proceeding it is proper to permit evidence of values for uses not otherwise permitted by an existing zoning ordinance. Such evidence is allowable provided, as here, there is a showing that if literally applied the zoning ordinance would result in an arbitrary and unreasonable restraint on the use of property and that there is a reasonable probability that in the foreseeable future the ordinance will be changed to allow the more liberal uses."
*573 If an owner of land being taken by eminent domain is in a position to make a showing which would be sufficient upon which to obtain, in a separate action, a judgment to liberalize the zoning thereof for higher and better uses, then it would seem clear that under the foregoing pronouncement in the Tallahassee case such a showing would be equally sufficient to permit the landowner to present evidence of such higher and better uses in proving value of the property in the eminent domain case. In such instance an effort by the landowner to achieve the same advantage by separate action should be rejected, and the landowner relegated to so proving value through such evidence in the eminent domain case, thereby avoiding the questionable practice of invalidating a zoning ordinance as to a particular parcel while its validity for the area remains intact, obviating the substitution by a court of its judgment for that of the legislative body as to the zoning thereof and precluding the entry of a spot zoning judgment.
Accordingly, the judgment in this case should be reversed, and the cause remanded with direction to dismiss the complaint, without prejudice.
NOTES
[1] "At all events, it is clear that the uses expressly permitted by W-R zoning classification are uses which, if deemed desirable by the City, may also be allowed in P-R classified properties. Recognizing that the Plaintiffs' property seems presently destined because of pending condemnation for a P-R/W-R classification by reason of its declared prospective public marina use, the City might be viewed at this late hour as equitably estopped to declare that the restrictive single family residential zoning on Plaintiffs' property bears any relationship whatsoever to public health, safety, morals or general welfare. In any case, the record seems perfectly clear that R-1 single family residential zoning restrictions upon the subject property are grossly unreasonable, no longer remotely suitable or desirable as applied to the plaintiffs' property, and as applied are arbitrary to the point of confiscation."
[2] The trial court considered the Donch opinion and concluded:

"The Court is thoroughly familiar with the facts, evidence and circumstances involved in Donch et al. v. City of Miami, 214 So.2d 503 (Fla.App.3rd, 1963), having examined the record therein upon joint request of the parties. The property, as well as surrounding facts, in Donch, however, is physically, environmentally, and esthetically distinguishable from the property and surrounding facts involved in matter sub judice. For example, the Donch property located considerable distance northerly of Rockerman Canal, which canal forms a natural boundary and which totally separates the subject property from Donch. Further, the tract involved in Donch was in fact encircled by residential zoning. Here, approximately 200 feet to the northeast and 445 feet to the southwest of the Plaintiffs' property is P-R zoning. A further distinguishing factor is that immediately to the north and south of the Donch tract were located developed residential subdivisions of single family residences. In contrast, the property here involved is bracketed and encircled by completely unimproved tracts bearing a P-R zoning classification.
"The evidence in this case clearly reflect recent zoning changes of nearby properties to the northeast as well and to southwest of the subject property, from R-1 to P-R. Indeed, th City of Miami's condemnation petition involving the Plaintiffs' property must be viewed as in the nature of an implicit recognition by the City legislative authorities that single family zoning is no longer needed, desirable or warranted upon the area to be condemned which includes the Plaintiffs' land. For these reasons, inter alia, the Court finds and determines Donch v. City of Miami, supra, entirely distinguishable and thus irrelevant to reasonable analysis of the evidence presented in this case."
[1] City of Miami Beach v. Ocean & Inland Co., 147 Fla. 480, 3 So.2d 364; State ex rel. Office Realty Co. v. Ehinger, Fla. 1950, 46 So.2d 601; City of Miami Beach v. Lachman, Fla. 1953, 71 So.2d 148; City of Miami Beach v. Wiesen, Fla. 1956, 86 So.2d 442, 444; Blank v. Town of Lake Clarke Shores, Fla.App. 1964, 161 So.2d 683.
[2] Parking Facilities v. City of Miami Beach, Fla. 1956, 88 So.2d 141, 143; Burritt v. Harris, Fla.App. 1964, 166 So.2d 168, 173; 35 Fla.Jur., Zoning Laws § 16.
[3] State ex rel. Taylor v. City of Jacksonville, 101 Fla. 1241, 133 So. 114, 116; State ex rel. Office Realty Co. v. Ehinger, supra, Fla. 1950, 46 So.2d 601, 602; City of Miami Beach v. Silver, Fla. 1953, 67 So.2d 646, 647.
[4] The parcel involved in the Donch case is not distantly located from the subject property. The map in evidence, drawn to scale, shows the two parcels are 700 feet apart, and that both are near the center of this general area zoned for single residences. Such zoning is not violated by the presence therein of the girl's school (parcel 9 on the map) since that use is permissible in a residential district (as expressly noted with relation thereto in the Donch case), nor by the use of city owned property for park purposes (parcels 4 and 8 on the map) because it is proper for a municipality to maintain a public park in a residential district and because property which is owned by a municipality and devoted to public use is not subject to or affected by the zoning ordinance. The idea that the Rockerman Canal (see map), a narrow dead-end waterway which runs inward from the bay between two parcels in this area, a short distance north of the subject property, constitutes a barrier, like the Great Wall of China, having the force of dividing this extensive zoned area, not affecting the residential zoned character of the portion thereof which lies to its north, but operating to make that portion of the residential area which lies to its south improperly zoned for residential purposes, seems far fetched. Such little waterways intruding into residential areas are prevalent in water front sections. Usually they are considered to enhance or improve residence property, rather than to relegate it to use for other purposes. A similar small dead end waterway lies on the north side of the subject property.
[5] Schauer v. City of Miami Beach, Fla. 1959, 112 So.2d 838 (applying the rule to legislative action of the municipality taken upon consideration of a proposed amendment to its zoning ordinance to liberalize the zoning of a certain parcel or parcels; and affirming City of Miami Beach v. Schauer, Fla.App. 1958, 104 So.2d 129); Board of Com'rs of State Inst. v. Tallahassee B. & T. Co., Fla.App. 1959, 108 So.2d 74, at 84-85; Housing Auth. of City of Melbourne v. Richardson, Fla.App. 1967, 196 So.2d 489, 492; City of Coral Gables v. Sakolsky, Fla. App. 1968, 215 So.2d 329, 333; Town of North Redington Beach v. Williams, Fla. App. 1969, 220 So.2d 22; Angle v. Chicago, St. P., M. & O.R. Co., 151 U.S. 1, 14 S.Ct. 240, 38 L.Ed. 55, 64.
[6] In regard to the matter of the motive of the city (which was irrelevant because not the subject of judicial inquiry in this case) it is interesting to note that when the owners of the subject property contend the city acted with improper motive to minimize the value for condemnation, they present an instance of the pot calling the kettle black. This litigation, instituted in the face of the action filed by the city for condemnation, would not appear to have been undertaken for practical use purposes, but to have been motivated by the desire for reclassification of the zoning of the subject parcel for more liberal uses in order to place the owners in a position to establish, on condemnation, a value thereof greater than might obtain to it as previously zoned.