**FISHER'S ISLAND, Inc., et al v. DADE COUNTY, et al.**
No. 76-40104
Circuit Court, Dade County.
November 1, 1977.

Alan T. Dimond of Greenberg, Traurig, Hoffman, Lipoff, Quentel, Wright & Wolff, Miami, for the petitioners.

Stuart L. Simon, County Attorney, and Robert A. Ginsburg and Stanley B. Price, Assistant County Attorneys, for the respondent.

HERBERT STETTIN, Circuit Judge.

*Opinion and final judgment granting petition for writ of certiorari:* This cause came before the court upon a petition for writ of certiorari to have reviewed a zoning resolution of the board of county commissioners of Dade County dated and rendered on

November 23, 1976, as Resolution No. Z-324-76.[1] Petitioners are Fisher's Island, Inc. and Fisher's Island Associates, Ltd., who are the owners and lessees of the property involved ("petitioners"). The respondents are Metropolitan Dade County and the board of county commissioners for Metropolitan Dade County ("Dade County"). Both parties have filed extensive briefs based upon the numerous documents and exhibits constituting the record in the cause. Dade County has accepted and adopted petitioners' statement of the facts and of the case with two additions.[2] Thereupon, the cause was orally argued upon the undisputed facts.[3] Based upon the foregoing, and the court's own review of the documents, exhibits and briefs, the following opinion is hereby rendered —

## I.  FINDINGS OF FACT

### 1.  THE PROPERTY

Fisher Island, consisting of 220 acres, is located in Dade County between Miami Beach and Virginia Key. The island is a spoil bank created by the dredging of Government Cut. Elevations on Fisher Island range from 5 to 10 feet above sea level. The vegetation consists primarily of Australian Pine which Dade County currently classifies as an undesirable species.

---

1.  The petition for writ of certiorari was accompanied by a second count for declaratory judgment and injunctive relief seeking a declaration that Dade County's Comprehensive Development Master Plan and implementing ordinances, as applied to petitioners' property, amounted to a confiscation of their property without just compensation or substantial due process. Upon stipulation and agreed order, further action by the parties on Count II has been withheld pending the court's determination of the petition for writ of certiorari.

2.  The county, in its brief, added to petitioners' statement of the case and of the facts that —

(a)  Fisher Island is a spoil bank created by the dredging of Government Cut — the only major channel of access to the port of Miami, one of the world's busiest passenger and commercial seaports; and

(b)  when petitioners' zoning application was presented to the county commission on November 23, 1976, the petitioners did not submit any evidence relating to the feasibility of developing their property in accordance with its Master Plan designation.

3.  The undisputed facts adopted by the parties are, in the opinion of the court, amply supported by the record in the cause.

The subject Fisher Island property consists of 179.23 acres. It is owned by Fisher's Island, Inc. and in 1973, was leased, with an option to purchase, to Fisher's Island Associates, Ltd. The remaining portion of Fisher Island has been zoned and utilized for industrial and residential purposes for over 25 years. It includes a 17 acre strip in the northeast corner of the island controlled by the University of Miami; a 10 acre fuel storage depot owned by Belcher Oil Co. on the north central shore of the island, and scattered residential lots in the interior of the island owned by the city of Miami Beach and various indivduals.

## 2. THE APPLICATION

On April 10, 1974, Fisher's Island Associates, Ltd., with the authorization and consent of Fisher's Island, Inc., filed an application for rezoning of 179.23 acres of land on Fisher Island. The application was filed after one year of consultation with county staff. It was proposed that the subject property be rezoned to permit approximately 5,000 condominium units and 1,500 hotel units as follows —

| | | Requests | Number of acres |
|---|---|---|---|
| A. | Parcel A | | |
| | Tract 1 | RU-4A Zoning | 20.50 |
| | Tract 2 | RU-4A Zoning | 37.74 |
| | Tract 3 | RU-4A Zoning | 21.51 |
| | Tract 4 | RU-4A Zoning | 27.69 |
| | Tract 5 | RU-4A Zoning | 25.66 |
| | Tract 6 | RU-4A Zoning | 28.94 |
| | | | 162.04 |
| B. | Parcel B | BU-2 Zoning | 10.16 |
| C. | Parcel C | BU-2 Zoning | 7.03 |
| | | | 179.23 |

The legal descriptions relative to parcels A, B and C are attached to the petition for writ of certiorari as Exhibit "C" and are hereby incorporated by reference. All such property was (and is presently) zoned "GU" which, as interim zoning, permits only one dwelling unit every five acres.

The aforesaid application was originally filed in accordance with the designation shown on Dade County's 1965 General Land Use Master Plan (GLUMP) which depicted most of the unzoned and undeveloped land on the island for high density residential use. While the Fisher Island zoning application was being considered by local and regional planning agencies, Dade County adopted a new Comprehensive Development Master Plan (CDMP) which

became effective on March 31, 1975.[4] Under the new CDMP, Fisher Island was shown within the development zone (Environmental Protection Zone Map) (Part II, CDMP) but, at the same time, was designated on the 1985 and year 2000 Metropolitan Development Pattern Maps for park and recreational uses. The Metropolitan Dade County Planning Department, in its preparation of the 1985 and year 2000 Development Pattern Maps, originally suggested this designation because of the policy of the board of county commissioners, adopted by resolution on November 20,

---

4. In Ordinance 75-22, the board of county commissioners: (a) reaffirmed the Metropolitan Development Policies previously adopted and enacted as Part I of the Comprehensive Development Master Plan by Ordinance No. 74-100; and (b) adopted and enacted as additional elements, the Environmental Protection Zone Descriptions and Map (Part II, Environmental Protection Guide, pages 105-15); the 1985 Metropolitan Development Pattern Map for Metropolitan Dade County, Florida (Part II of Appendix - Metropolitan Development Guide); the year 2000 conceptual Metropolitan Development Pattern Map for Metropolitan Dade County (Part III Appendix - Metropolitan Development Guide); the estimated Population Distribution Map (Part III, figure 28 of the Metropolitan Development Guide, page 191) and the Metropolitan Development Planning Proposals (Part III, Metropolitan Development Guide, pages 187-206).

Pursuant to Ordinance 75-47, Section 1, which further implemented Ordinance 75-22, the words "Comprehensive Development Master Plan" were defined to mean and refer to Comprehensive Development Master Plan for Metropolitan Dade County, adopted by Ordinance 75-22 on March 31, 1975, or as amended. That section then defines the phrase "conforms to the Comprehensive Development Master Plan" as meaning any zoning request or action which is consistent with the goals, objectives, standards and policies of the Comprehensive Development Master Plan.

The Comprehensive Development Master Plan was endowed with legal status by both Section 4 of Ordinance of 75-22 and Section 7 of Ordinance 75-47. Pursuant to Section 3 of Ordinance 75-22, the commission declared its policy and intent to evaluate and consider all its public action involving or affecting land use or development, including action on applications for zoning relief, as to its conformity with the policies, objectives, guidelines, and standards expressed by and through the Comprehensive Development Master Plan; and as to whether such action or actions will better serve the community. The ordinance further mandated the county manager and county attorney to prepare and submit a subsequent ordinance establishing procedures which implemented and gave further effect to the requirements of Ordinance 75-22. In accordance with that mandate, the commission later enacted Ordinance No. 75-47 which established procedures and standards by which it would evaluate and take final action upon zoning applications.

1973, urging the state of Florida to acquire Fisher Island for public purposes and recreational uses. The state of Florida, by and through its appropriate agencies, has evidenced no intention of acquiring the undeveloped portion of Fisher Island.

On April 11, 1975, Fisher's Island Associates' application for a "Development of Regional Impact" (DRI) was accepted by the South Florida Regional Planning Council (SFRPC). The SFRPC's report and recommendation was issued on July 10, 1975. The recommendation was to deny the proposed Fisher Island DRI because of insufficiency of information contained in the Application for Development Approval (ADA) concerning development plans, methods and technology.

At the county commission public hearing of July 23, 1975, the applicant, through its attorney, requested a deferral of the zoning application for a period of 120 days. The purpose of the deferral was to address many of the questions raised by the SFRPC in its report. The county commission granted the 120 day deferral and the zoning application was rescheduled for hearing by the county commission on November 26, 1975. During the interim period, Fisher's Island Associates made substantial revisions in the initial development plan in an effort to respond to the Comprehensive Development Master Plan and the comments of the local and regional agencies. As reconstituted, the new Fisher Island Plan called for a maximum of 200 hotel dwelling units, and a residential-designated community, consisting of 1,200 beach houses and villas; a lodge; an island-club house and tennis courts; a boat basin; and an island center containing a fire station, a meeting room for civic and religious use and a small retail area. The proposed development is to be controlled by a detailed "Declaration of Restrictive Covenants Governing Development of Fisher Island," which was voluntarily proferred as part of the revised Letter of Intent. The revised Letter of Intent described the Fisher Island project as follows —

The concept of a recreational community is new in Dade County. The nearest comparable development is the Ocean Reef Club on Key Largo. The chief characteristics of a recreation community are: (1) isolation from conventional residential areas, (2) emphasis on recreational facilities such as tennis, boating, biking, fishing, and (3) the availability of club or lodge facilities for guests and entertaining.

Fisher Island is well suited, both in size and location, for this type of development. It is accessible only by water, yet conveniently located with respect to the shopping and entertainment centers of Miami and Miami Beach. It has both ocean front and bay-front sand beaches, direct access to deep water channels capable of handling the largest yachts, and a higher elevation than many of the already developed waterfront areas of Miami and Miami Beach.

The area occupied by buildings on Fisher Island will constitute less than 20 percent of the land available for development. The beach houses and villas will be built in clusters around the east, south and west perimeters of the island and around a centrally located marina.

All residences and other structures will be set back a substantial distance from the beaches to allow unobstructed access to the water. The greatest part of the island will be permanently reserved for landscaped open spaces containing walk ways, bicycle trails, and other recreational amenities.

The lodge will be a low-rise structure consisting of a central building and clusters of attached beach houses. A large, existing home on the island formerly owned by the Vanderbilt family and industrialist Gar Wood will be used for a clubhouse.

Access to the island will be by specially designed automobile passenger ferries operating between terminals on the north shore of the island and property on the MacArthur Causeway which is already controlled by Fisher Island Asscoiates. Two ferries are planned, each with a capacity of 22 automobiles and 40 passengers. Travel time between terminals will be approximately five minutes. A road system will be constructed on the island and sufficient parking spaces provided to meet all applicable requirements.

The applicant also sought, and obtained, a Binding Letter of Interpretation from the State of Florida Division of Land Planning which indicated that the revised application was no longer subject to the review jurisdiction of the SFRPC. As revised, the application for zoning was as follows —

*District Boundary Changes:*
— *Parcel A,* Tracts 1 through 6, 162.04 Acres
　　Present zone classification: GU
　　Zone classification desired: RU-4A
— *Parcel B,* 10.16 Acres
　　Present zone classification: GU
　　Zone classification desired: BU-2
— *Parcel C,* 7.03 Acres
　　Present zone classification: GU
　　Zone classification desired: BU-2

*Unusual Uses:*
— Unusual usues to permit recreation facilities, to-wit, 16 tennis courts to be utilized in connection with the club use on Parcel C and hotel use on Parcel A, Tract 1.
— Unusual use for boat basin or marine, with no gas pumps, and limited to 86 boat slips.

*Use Variance:*
— Use variance and unusual use to permit BU-3 use in RU-4A zone, to-wit, a ferry terminal, and to permit noncommercial parking in a zone more restrictive than the use it serves.

On November 26, 1975, the county commission again deferred action on the application until January 13, 1976, to obtain an Attorney General's opinion regarding whether the SFRPC had jurisdiction to review the revised application. The Attorney General ruled that it did not have such jurisdiction. On January 13, 1976, the county commission deferred the application until February 9, 1976 in order to allow the county staff to determine the best long range use for the island. On March 9, 1976, the application was again deferred until July 13, 1976, pending the outcome of hearings before the Planning Advisory Board (PAB) to change the land use designation to the CDMP as indicated below. On July 13, 1976, the application was deferred for the last time until November 23, 1976, to permit the county to submit a referendum to the electorate on whether to issue general obligation bonds to acquire Fisher Island for public park and recreational purposes. As set forth below, the referendum concept was abandoned and the county commission took final action on the application on November 23, 1976.

### 3. RECOMMENDATIONS OF COUNTY DEVELOPMENTAL IMPACT COMMITTEE

In adopting and implementing its Comprehensive Development Master Plan, the board of county commissioners created and established the Developmental Impact Committee (DIC), a multidisciplined group of county experts, to address the impact of zoning applications on — (1) conformance with all applicable plans; (2) environmental impacts; (3) impact on the economy; (4) impact on essential services; and (5) impact on public transportation facilities and accessibility. In its detailed recommendation on Fisher Island, dated November 17, 1975, the DIC concluded that the Fisher Island application had adequately provided for the majority of its services with little impact on existing systems and that the primary issue was conformance with the CDMP. The DIC summarized its own recommendations as follows —

"Recommendation"

*Denial without prejudice or deferral* until such time as the Comprehensive Development Master Plan can be reaffirmed or amended. Although the Developmental Impact Committee has evaluated herein the revised plan for rezoning and development of Fisher Island, the *main issue is acknowledged by the committee to be one of whether any type of urban development other than primarily for park and recreation purposes as designated on Dade County's recent adopted Comprehensive Development Master Plan should be approved on Fisher Island regardless of results of impact evaluation.*

The committee respects the policy and development guidelines embodied in the Comprehensive Devlopment Master Plan and the importance of upholding the integrity of the Master Plan. For this reason, the committee

*does not believe that the zoning process should decide the development policy for Dade County or automatically result in modifying the adopted Master Plan. Because of the unique location and character of the subject parcel, the correct procedure would be for this proposed development concept to be the subject first of evaluation of amendment to the master plan as provided in the adopting ordinance, then consideration of a specific zoning and development plan which is now before the commission. It is for this reason that the committee recommends denial without prejudice of the application or deferral pending receipt of the action by the Fisher Island developers for amendment to the Comprehensive Development Master Plan.*

## Summary

*The executive council contends that while no major objections exist to the proposed site plan and accompanying proposals, the primary issue here is conformance with the Comprehensive Development Master Plan. The applicant has adequately provided for the majority of services to this community with little impact on existing systems. Proferred agreements have been drawn which include the concerns of all represented departments;* however, two issues are left unresolved:

1. Approval from the City of Miami Beach as to the use of the incorporated land proposed as the mainland ferry terminal.

2. No indication has been received from the U. S. Coast Guard as to the impact created by the diagonal crossing of ferry boats on shipping traffic within Government Cut Channel. (Emphasis added.)

The remaining portions of the DIC report outline in significant detail the impact of the proposed development on the environment of Fisher Island and on necessary governmental services. The report also referred to and incorporated the specific commitments made by the applicant, through its Declaration of Restrictive Covenants, to assure compliance with county concerns. The essence of this portion of the report is that —

(1)     The proposed development would not have a detrimental impact on the environment of Fisher Island in that there are no desirous species of plants or animals on the island.

(2)     There presently exists sufficient reserve water capacity in the City of Miami Beach water system and in the 20″ Fisher Island main which currently serves the island to supply the estimated .19 MGD potable water demand that will be generated by the development.

(3)     Sewer service and waste water treatment is available through two alternative means and sufficient reserve sewer capacity exists to assimilate the .19 MGD sewage flow generation which would be produced by the development.

(4)    The development meets all county open space requirements and, through the Restrictive Covenants, provides for the establishment and maintainance of a detailed landscaping system; provides for a sixty-six boat marina, with 10 boat slips to be devoted to the use of non-residents of the island; agrees to make available to the public a portion of the Atlantic Ocean beach of Fisher Island which extends 50 feet landward of the mean high water line, and assures access to the beach through a public access easement.

(6)    Existing schools in Miami Beach will accommodate the estimated 498 school age children which would be generated by the development.

(7)    The applicant, through its Restrictive Covenants, bound itself to make a $25,000 cash contribution to the county upon the issuance of the first certificate of occupancy for the purchase of a marine patrol boat to be operated by the county for the purpose of providing police protection for the island community.  The applicant also agreed to provide a reserved docking space in the boat basin for the marine patrol boat, without cost to the county.  The applicant agreed that each dwelling unit constructed in the island community will contain intrusion sensors and heat and smoke detectors to assure a unified security system.

(8)    The applicant agreed to donate and convey to the county, without cost, a site for a fire station.  The applicant further agreed to construct a fire station on the site, which fire station is to have a maximum of 7500 square feet, without cost to the county, which shall be the property of the county.  Moreover, the applicant agreed to make a cash contribution to the county in the aggregate sum of $275,000 to purchase fire fighting equipment to be utilized in conjunction with the fire station for the fire protection of the island community.

(9)    The county determined that the proposed development would have no significant impact on transportation facilities and that the transportation system designed to service the island was adequate for the needs of its residents.  It was envisioned that the transportation system would be maintained through a special taxing district which could include the ferry service as well as the mainland terminal.  It is noted in the DIC report that

> "Careful evaluation has been done by the Department of Traffic and Transportation and Public Works.  Both departments are in agreement that the proposed transportation system is adequate.  Some modification will be necessary within the right-of-way on McArthur Causeway to provide ingress and egress to the terminals; however, this will be at the expense of the developer."

By its covenant, the applicant agreed that with one ferry boat in operation no more than 400 dwelling units of which no more than 350 are multifamily will be occupied prior to a traffic analysis by the county to determine the needs of the existing and future island community; or if two ferry boats are in operation no more than 800 dwelling units will be occupied prior to the analysis.  Finally, the covenant provided that no building shall be

occupied until it is demonstrated to the county's satisfaction that, among other things, adequate ferry service is provided by the developer.

(10) There is more than adequate time for the evacuation and dispersal of persons from Fisher Island in the event of a hurricane alert (and evacuation).

## 4. APPLICATION TO AMEND MASTER PLAN

Pursuant to the specific recommendations of the DIC set forth above, Fisher's Island Associates, in April, 1976, filed an application in accordance with Dade County ordinance procedures to amend the Metropolitan Development year 1985 and 2000 Pattern Maps from parks and recreational designation for Fisher Island to "medium density residential and activity center." This application was one of 58 requests for amendments to the CDMP. All of the applications were evaluated by the Dade County Planning Department pursuant to the mandate set forth in Section 2-116, Code of Metropolitan Dade County. With the exception of the Fisher Island application, the planning department uniformly recommended denial of all the requested amendments.

In both its "preliminary" and "final recommendations" on the proposed amendments to the Comprehensive Development Master Plan, the planning department unconditionally recommended that the land use designation of Fisher Island be changed from ". . . 'Parks and recreation' to 'medium density-up to 11.0 dwellings per gross residential acre' to permit development of the island for residential purposes." In its preliminary recommendation, the planning department, recognizing that no federal, state or local funds were available to purchase Fisher Island, stated —

> . . . the private development of Fisher Island as proposed would not place a greater burden on the taxpayers of Dade County than a similar development in the already urbanized-portion of Dade County on the mainland. The presence of an adequate water supply; the willingness of the developer to provide for sanitary sewer hook-up to the Virginia Key Sewerage Treatment Plant; the provision of a privately owned and operated ferry service which obviates the need for a bridge or causeway, and the substantial contribution the developer has pledged for the provision of police and fire protection demonstrate that this proposed development will not detract from services that are needed and programmed — for already developed and developing sections of the county. (page 117 — Recommendations for Proposed Amendments to the Comprehensive Development Master Plan for Metropolitan Dade County. (Emphasis added.)

As part of its preliminary recommendation, the planning department found and determined that the Fisher Island application

*furthered* the following goals, policies and objectives of Part I of the Comprehensive Development Master Plan —

1. *Environment: I-F*
   Ensure that Dade County's beaches and wetlands are preserved for the enjoyment of residents and tourists, and that the needs of the natural environment are met.

2. *Environment: I-F.6*
   Requires local government and the private sector to preserve shoreline areas for public uses requiring water access that are harmonious with the natural environment.

3. *Services: I-A.6*
   Allow development or redevelopment in new areas or in already populated areas only at such time as all development standards and requirements, including the provision of services, are accomplished.

4. *Services: I-B.2*
   Direct growth in a manner whereby public services can be effectively provided without adversely affecting general welfare of the community.

5. *Development Pattern: I-A.1*
   Limit urban expansion to those areas most suitable for new development or redevelopment on the basis of accessibility, cost of energy, extension of services, terrain, and criteria directed toward preserving vital aspects of Dade County's natural and man-made environment.

6. *Development Pattern: I-G*
   Metropolitan government should encourage the development of new communities, new-towns-in-town, and planned residential development.

7. *Development Pattern: I-H*
   The general configuration of Dade County's metropolitan growth should emphasize concentration around centers of activity rather than directionless sprawl.

In its final recommendations, the planning department summarized the reasons in support of the application. These included—[5]

1. Abundance of public held lands in the area — Miami Beach, Virginia Key, Key Biscayne, and Biscayne National Monument. Sufficient for future needs of metropolitan area . . .

2. 1970 adopted Open Space and Recreation Master Plan does not show Fisher Island for acquisition . . . Consequently, it was not included in the Decade of Progress bond issue, where funds were allocated to specific purchases and improvements.

3. Cost/benefit ratio of Fisher Island is not favorable because of inaccessible location to automobiles . . . In order to make the island more accessible

---

5. Citations included in the final recommendations are omitted.

for public use, a bridge or causeway would have to be constructed, and past proposals for this type of improvement have either proven to be unfeasible or have met with strong citizen opposition . . .

4. No funds are available for public purchase of Fisher Island . . .

5. The development as proposed would not place a greater burden on the taxpayers of Dade County than a development of similar intensity located in the already urbanized portion of the county on the mainland . . .

6. There are no plans for the expansion of the seaport to Fisher Island . . .

7. There is nothing of environmental significance on Fisher Island; it is a spoil bank . . .

8. The diversion of local funds for the purchase and improvement of Fisher Island could make it necessary to stop the purchasing and improving of already committed projects — 3 marinas and several community and neighborhood parks . . .

9. Fisher Island was originally shown on 1985 Pattern Map as Parks and Recreation in anticipation of state funding for its purchase. As this funding is not available, it should be changed to allow private development . . .

10. The presence of a substantial amount of buying power, such as would be represented by Fisher Island, would enhance the viability of the Miami and Miami Beach business districts . . .

11. Provision of transportation facilities as proposed by developer is adequate for type of development to be built on Fisher Island, according to Dade Department of Traffic and Transportation.

12. Warning of natural disaster, such as hurricane, is usually sufficient to permit evacuation of Fisher Island in plenty of time to avoid loss of life.

13. Fisher Island Plan calls for a recreation community which requires isolation from conventional residential areas . . .

14. Half of property will be left in open space . . .

15. Adequate water services on island at present . . .

16. Covenants prohibit further development after the first 400 units should ferry service be inadequate . . .

17. Public access to the beach is guaranteed by covenants . . .

Also, as a part of its final recommendations, the planning department *reconfirmed that the development was in conformance with the goals and objectives of the Comprehensive Development Master Plan* and then technically responded to the comments of certain citizen groups which encouraged public acquisition of Fisher Island. The final recommendations stated —

The Planning Department has heard no new information at the public hearings that would cause it to modify its original recommendation that Fisher Island's use designated on the 1985 Development Pattern Map be changed to permit its development.

*The Planning Department maintains that this development is in conformance with the goals and objectives of the Comprehensive Development Master Plan. This development is within the already urbanized portions of the county, and the services required would place no greater burden on local taxpayers than a development of similar intensity on the mainland in the already-developed area of the county. Furthermore, this development, so close to the downtown areas of Miami and Miami Beach, will contribute to their economic well-being.*

Opposition to the requested amendment suggest that the Park and Open Space designation of Fisher Island be retained on the 1985 Development Pattern Map even though there is no source of funds for its purchase for public use. Serious questions must be raised as to the suitability of Fisher Island for public use. To be worth the millions of dollars that its purchase and development would entail, this island would have to be made more accessible to the public. A bridge or causeway is unfeasible from both an engineering and public acceptance point of view.

The Planning Department believes that this is not a proper utilization of public funds, either now or in the foreseeable future, but particularly at present when money for public projects of all kinds is so scarce. What few dollars there are available for public parks should be spent where they will be used by the greatest number of people possible, like community parks, neighborhood parks, and marinas.

The Planning Department, in the absence of any compelling reason to do otherwise, maintains its original recommendation. (Emphasis added.)

On June 2, 1976, the planning advisory board, although expressing concern over certain transportation and cost-revenue aspects of the proposed development, voted 5-1 to uphold the planning department's recommendation that the Fisher Island application to amend the Comprehensive Development Master Plan from a "Parks and Recreation" designation to "Medium Density Residential" be approved.

On June 29, 1976, the board of county commissioners met in special session to consider the proposed Master Plan amendments. After public hearing, it was moved that the application of Fisher's Island Associates, Ltd. be denied and, by a vote of 6 to 2, the motion was approved. As evidenced in both the official minutes and transcript of proceedings, the commission's action was predicated on the desire to preserve Fisher Island for public park purposes. In connection therewith, the commission directed the interim county manager to submit his report and recommendations to the board

within 75 days with regard to a proposal, to be placed on the November 2, 1976 ballot, for an appropriate bond issue to purchase and develop Fisher Island for park and recreation purposes.

On October 18, 1976, the board of county commissioners met in special session to take final action in connection with the application of Fisher's Island Associates (and others) to amend the Comprehensive Development Master Plan. At the hearing, the planning director for Metropolitan Dade County again reaffirmed his position that the application ought to be approved. The official minutes summarize his testimony as follows —

> Mr. Walters stated that Fisher Island is a spoil bank and is in a different situation than endangered lands. He said if the island is to be used for parks and recreation, its cost of acquisition will be millions of dollars; also, its development will also cost millions of dollars; therefore, it is felt that the allocation of these funds could be put to better use in Dade County. He advised that the planning advisory board has conducted public hearings on this matter at which great interest was shown, and after considering what they heard, the membership voted to uphold the planning department's recommendation to amend the Master Plan. In answer to a question posed by Commissioner Schreiber, Mr. Walters explained how Fisher Island was designated for park and recreational purposes and then the sequence of events which occurred to cause the planning department to change its recommendation.

The minutes then reflect the following commission action on the application —

> It was moved by Commissioner Ruvin that the board deny the application of Fisher Island Associates, Ltd., for amendment to the Dade County Comprehensive Development Master Plan. This motion was seconded by Commissioner Redford.

> *Commissioner Oesterle questioned the Assistant County Attorney regarding the legality of designating Fisher Island for park and recreational purposes on the Master Plan.*

> Assistant County Attorney Ginsburg stated that he has given this question much thought and he has arrived at the opinion that *the designation of park and recreational purposes on the current Master Plan may properly be applied to private property in Dade County. He said the courts are more likely to order the county commission to rezone the property in any event regardless of the Master Plan; further, as an alternative the county could declare the property condemned, but the courts will say that the county by its action has already acquired the land and has deprived the owner the use of his land, and at that point there will be a jury trial at which it will be determined how much the county must pay for the property.* He stated he was presenting this information at this time so that the board understands the consequences of the situation.

*Commissioner Redford questioned if it will be possible to designate this property from parks and recreation to low density — the same density as GU or one house for every 5 acres. Assistant County Attorney Ginsburg advised that it is possible to reidentify Fisher Island from parks and recreation to low density at this time.*

Commissioners Ruvin and Redford thereupon withdrew their motion to deny the application of Fisher Island Associates, Limited.

*It was moved by Commissioner Redford that the board approve the reidentification of the Comprehensive Development Master Plan from parks and recreation to low density (up to 1.5 units per acre), and that the Master Plan be amended accordingly.* This motion was seconded by Commissioner Ruvin. Following a discussion, the board voted upon Commissioner Redford's motion, and upon being put to a vote, passed by . . . an [8 to 0 vote.] *It was moved by Commissioner Schreiber that the county attorney be instructed to prepare an appropriate resolution for the employment of appraisers to conduct an appraisal of the Fisher Island property and submit their figures as quickly as possible; further, that a question be placed on the ballot no later than March, 1977, concerning the purchase of the Fisher Island property for park and recreation purposes.* This motion was seconded by Commissioner Redford.

Following a discussion, the board agreed to further discuss Commissioner Schreiber's motion in the regular meeting set for tomorrow October 19, 1976. (Emphasis added.)

At its regular meeting of October 19, 1976, the board of county commissioners decided against expending funds to obtain an appraisal of the Fisher Island Property and decided against conducting a special election concerning possible acquisition of Fisher Island as a park site.

On November 23, 1976, the Development Impact Committee reissued its recommendation on the Fisher Island zoning application. The recommendation stated in its entirety says —

*The executive council affirms its recommendation of denial without prejudice due to the fact that this application is not in conformance with the Comprehensive Development Master Plan. This recommendation is premised on the recent Master Plan amendment from a Parks and Recreation designation to one of low density development (up to 1.5 units per acre). This amendment action was taken by the board on Monday, October 18, 1976 and confirmed by the present commission on November 2, 1976.*

*The Council's evaluation of the present proposed site plan and accompanying proposals is unchanged. The comments contained in the attached Developmental Impact Committee Report, dated November 17, 1975, are confirmed.* (Emphasis added.)

## 5. ACTION OF THE COUNTY COMMISSION ON ZONING APPLICATION

The Fisher Island zoning application, as amended, came on for hearing before the county commission on November 23, 1976. At the hearing, the applicant's attorney outlined the entire sequence of events referred to above. He then inquired as to whether the commission would consider the application at all in light of its prior action on the Master Plan amendment. On assurance that he would be accorded a fair hearing, the attorney introduced Mr. John Simons, an environmental design and zoning expert, who discussed the Fisher Island Plan and the reasons why the application should be granted. The record also reflects that the commission examined documentary evidence that the Fisher Island project would *net* $1.7 million to the county after services were paid for. Petitioners, at the hearings, agreed to pay for the updated costs of five facilities, from $275,000 to $367,000. Following the petitioners' presentation, the county commission heard the testimony of objectors and their witnesses who expressed concern over matters pertaining to the adequacy of public facilities to serve Fisher Island and the cost-benefit ratio thereof to the county.

Upon the close of the public hearing, the application was moved and seconded for approval. The motion was defeated and thereafter the county commission voted to deny the application without prejudice. Its action was incorporated in Resolution Z-324-76 which determined that the requested district boundary changes and unusual use variance would be incompatable with the neighborhood and area concerned and would be in conflict with the principle and intent of the Plan for the development of Dade County.

## II. APPLICABLE LAW

The constitutional relationship between sophisticated land use control and basic private property rights has been the subject of numerous recent court decisions. See e.g., *Steel Hill Development, Inc. v. Town of Sanbornton,* 469 F.2d 956 (1st Cir. 1972); *Construction Industry Association of Sonoma County v. City of Petaluma,* 522 F.2d 897 (9th Cir. 1975); *Norbeck Village Joint Venture v. Montgomery County Council,* 254 A.2d 700 (Maryland 1969); *Golden v. Planning Board of the Town of Ramapo,* 30 N.Y.2d 359, 334 N.Y.S.2d 138, 285 N.E.2d 291 (1972). Essentially, the courts have regarded rational land use planning, based upon deliberation and forethought, as long overdue. The state of Florida and Metropolitan Dade County have been active participants in what has been characterized as a quiet revolution in land use reform. In recent years, such landmark legislation as the Florida Environmental Land and Water Management Act of 1972 (Chapter 380 et seq., Florida Statutes) and the Local Government Com-

prehensive Planning Act of 1975 (Section 163.3161 et seq., Florida Statutes) have been enacted. Indeed, under the Local Government Comprehensive Planning Act, every municipality and county in the state of Florida must adopt and implement a comprehensive plan on or before July 1, 1979. Pursuant to Section 163.3194(2)(a) of the Act, all land use decisions, including the adoption and implemention of zoning regulations, must be consistent with adopted portions of the comprehensive plan. Pursuant to Section 163.3194-(3)(a) of the Act, the courts of this state are legislatively empowered to consider and evaluate the reasonableness of the comprehensive plan relating to the issue justiciably raised or the appropriateness and completeness of the comprehensive plan in relation to the governmental action or development regulation under consideration. Thus, it is evident that in future years, as herein, Florida courts will be requested, with continued frequency, to examine and decide basic questions pertaining to the sensitive balance of public and private rights resulting from the adoption and implementation of comprehensive land use plans.

Since its enactment the nature and legal significance of the CDMP has been considered in two recent opinions of circuit courts in this circuit. In *Dade County Association of Unincorporated Areas, Inc. v. Board of County Commissioners of Metropolitan Dade County*, 45 Fla. Supp. 193 (1975), the circuit court was requested to overrule a decision of the county commission which granted zoning in violation of the land use provision of the CDMP. In striking the commission's action, the circuit court held —

> The adoption of a comprehensive development plan obligates the local legislative body to carefully plan for the future and to best effectuate the goals of the community within the principles and guidelines enunciated therein . . .

> The recommendations and conclusions contained in the Comprehensive Development Master Plan . . . may not be indiscriminately ignored in the exercise of the zoning power. The enactment of the Master Plan ordinances . . . repesents an affirmative commitment by the board of county commissioners to the public to implement the community goals and policies whenever applicable. Therefore, the official recommendations and conclusions of the Master Plan and the Area Restudy carry a presumption of correctness and they should be followed unless there are compelling reasons to depart therefrom. (45 Fla. Supp. at 198.)

In *Castellano v. Dade County*, 45 Fla. Supp. 106 (1976), the circuit court again commented upon the burden of proof of one who seeks governmental action contrary to the Plan recommendation —

> Nevertheless, the legal framework within which such property rights are held is affected by the adoption of the CDMP. Both the Dade County Code

and the courts reflect the impact of master planning on the zoning process. The adoption of the CDMP has an effect on property owners who, like the plaintiff, wish some type of zoning action incident to development. This effect is best expressed by examining the burden of proof imposed on one who seeks governmental action contrary to CDMP recommendations. *A party proposing a change* (or wishing to retain a status quo) *that departs from the plan carries some burden of showing that the plan recommendation is unreasonable or inapplicable to the specific parcel or proposed use.* (45 Fla. Supp. at 109.) (Emphasis added.)

Under prior traditional Florida zoning law, the authority of a municipality or county to pass and adopt a comprehensive zoning ordinance and plan is without dispute. It has been recognized that the police powers of cities and counties are sufficiently broad to control the use of private property under a general plan. *Town of Surfside v. Abelson,* 106 So.2d 108, 109-110 (Fla. 3d D.C.A. 1958). However, it is likewise fundamental that the application of the plan or zoning regulation must not be unreasonable or arbitrary by exceeding the bounds of public necessity. *Davis v. Sails,* 318 So.2d 214 (Fla. 1st D.C.A. 1975); *City of St. Petersburg v. Aikin,* 217 So.2d 315 (Fla. 1968); *Burritt v. Harris,* 172 So.2d 820 (Fla. 1965); *Watson v. Mayflower Property, Inc.,* 177 So.2d 355 (Fla. 2d D.C.A. 1965), cert. den. 183 So.2d 215; *Town of Surfside v. Abelson,* supra., 106 So.2d 108.

In *State ex rel. Henry v. City of Miami,* 158 So. 82 (Fla. 1934), Chief Justice Davis, in his concurring opinion, stated the guidelines for reviewing zoning in accordance with comprehensive plans. He said —

Therefore in order to be constitutional under the due process clause of the Fourteenth Amendment to the Federal Constitution, zoning ordinances must be passed in aid of some "plan" that is general and comprehensive in character when they undertake not only to regulate temporary uses of property but the manner of permanent construction of the buildings erected on affected property. *Euclid, Ohio v. Ambler Realty Co.,* 272 U. S. 387, 47 S. Ct. 114, 71 L. Ed. 303, 54 A.L.R. 1016, supra; *Eubank v. City of Richmond,* 226 U. S. 137, 33 S. Ct. 76, 57 L. Ed. 156, 42 L.R.A. (N.S.) 1123, Ann. Cas. 1914B, 192. *A zoning ordinance enacted simply as a piece of guesswork, with no attempt to study the city's problems and no effort to accomplish some general plan adapted to the city's needs in the way of health, safety, prosperity, welfare and the like, and attended by no surety of the existing situation to which it applies is generally unsustainable as a reasonable or valid police regulation.* Metzenbaum, Law Of Zoning, page 130.

Legislators may not, under the guise of the police power, impose restrictions that *are unnecessary or unreasonable* upon the use of private property or upon the pursuit of useful activities. The right to devote one's real

estate to any legitimate use is properly within the protection of the Constitution of the United States. *State of Washingon v. Roberge,* 278 U.S. 116, 49 S. Ct. 50, 73 L. Ed. 210, 86 A.L.R. 654. . . .

\* \* \*

The constitutional necessity is not for a single comprehensive ordinance or statute but for some general comprehensive plan. Such plan must set up a standard capable of ascertainment by legal means and not leave consent to withhold approval as to particular persons or properties to the whim or caprice of the officials who may be temporarily vested with special authority to give or withhold consent to use one's property as one sees fit. As was pointed out in a very recent case decided by the United States Supreme Court *(State of Washington v. Roberge,* 278 U. S. 116, 49 S. Ct. 50, 73 L. Ed. 210, 86 A. L. R. 654, supra), every owner of municipal property has the constitutional right to devote his property to any legitimate use he may deem fit. And the exclusion by a zoning law of some particular use to which a particularly situated property might otherwise be put is only warranted when subordination or limitation of the right to such particular use is *indispensable to the accomplishment of some general zoning plan.* In that case the federal Supreme Court struck down a provision of law that undertook to authorize a limitation on the use of private property uncontrolled by any standard or rule prescribed by competent legislative authority in order to accomplish a general plan that the Legislature has determined should be accomplished for the benefit of the public health, safety, morals or general welfare. (158 So.2d at 84-85.) (Emphasis added.)

In *City of St. Petersburg v. Aikin,* 208 So.2d 268, (Fla. 2d D.C.A. 1968), the Second District Court of Appeal considered the relationship between a comprehensive zoning plan and its effect on private property rights. Although the Second District's decision was quashed by the Florida Supreme Court in *City of St. Petersburg v. Aikin,* supra, 217 So.2d 315, its action was predicated upon a conflict of opinions as to whether the obligation was upon the zoning authority or the landowners to prove the reasonableness or necessity of zoning classifications when assaulted. While the Supreme Court determined that the initial burden was not upon the governmental authority, it did not, in its opinion, modify or affect the statement of the District Court that the integrity of a zoning plan will not *per se* justify the limitations on the highest and best use of property unless the plan itself is a reservoir of the public health, safety, morals and welfare. The District Court stated —

. . . This Court might note, parenthetically, that planning and zoning is a dynamic and ever changing function, and that while a fixed and long range program is indispensable to good zoning and planning practices, a rigid and unyielding adherence to this plan is as well calculated to stultify progress as it is to promoting it. A zoning plan ought to be like a well tailored jacket, sufficient to protect the user thereof, but without restricting the wearer to the

point that achievement of objective is made impossible. In the latter case it becomes a legislative straight-jacket restricting growth and activity.

\* \* \*

*The integrity of a zoning plan will not per se justify the limitations on the highest and best use of property unless the plan itself is a reservoir of the public health, safety, morals and welfare. . . .* (208 So.2d at 272-73.) (Emphasis added.)

In determining the validity of zoning restrictions, Florida courts have uniformly recognized that zoning resolutions or ordinances are not different from other municipal ordinances or resolutions. They are presumed valid and should not be interfered with by the courts, unless they are arbitrarily and unreasonably applied to the particular piece of property. *Smith v. City of Miami Beach,* 213 So.2d 281 (Fla. 3d D.C.A. 1968). In so determining, courts will not ordinarily substitute their judgments for those of the legislative body of a county. The time-honored test established by the United States Supreme Court and applied in Florida is whether a particular ordinance or resolution, as applied to a particular piece of property, is "fairly debatable." That is, if the contention that a zoning ordinance serves the health, safety, morals or general welfare of the public can be supported by grounds that are fairly debatable — i.e., are open to dispute or controversy on grounds that make sense or point to a logical deduction that in no way involves its constitutional validity — then the courts should not substitute their judgment for that of the zoning authority. *See Smith v. City of Miami Beach,* supra, 213 So.2d 281; *City of Miami Beach v. Wiesen,* 86 So.2d 442 (Fla. 1956); *City of Miami Beach v. Lachman,* 71 So.2d 148 (Fla. 1953); *Davis v. Situs, Inc.,* 275 So.2d 600 (Fla. 1st D.C.A. 1973); *Dade County v. Yumbo, S.A.,* 348 So.2d 392 (Fla. 3d D.C.A. 1977).

It has been further recognized that the burden of parties seeking relief from a zoning resolution as to a particular piece of property is an extraordinary one and it is upon the petitioner (property owner) to show that the application for rezoning raised a matter which was not even fairly debatable before the legislative authority. See *City of St. Petersburg v. Aikin,* supra., 217 So.2d 315; *Smith v. City of Miami Beach,* supra, 213 So.2d 281; *Metropolitan Dade County v. Kanter,* 200 So.2d 624 (Fla. 3d D.C.A. 1967). In determining whether the resolution is fairly debatable, it does not matter that there was competent evidence against the resolution, and that such evidence might well have sustained the position of the county had it enacted a resolution to permit the requested use of the property. What is important is that there be substantial competent evidence to support the decision of the county commissioners and to show that the matter in issue is at least fairly debatable. See *Besse-*

*mer Properties, Inc. v. Miami Shores Village,* 110 So.2d 87 (Fla. 3d D.C.A. 1959); *Dade County v. Epstein,* 181 So.2d 556 (Fla. 3d D.C.A. 1965).

In applying the fairly debatable rule, Florida courts have held that a zoning resolution is not invalid merely because it prevents the owner from using the property in a manner which is economically most advantageous. If economic advantage were the rule, no zoning would ever stand. *City of Miami v. Zorovich,* 195 So.2d 31 (Fla. 3d D.C.A. 1967), cert. den., 201 So.2d 554; *Metropolitan Dade County v. Greenlee,* 224 So2d 781 (Fla. 3d D.C.A. 1969). It is not necessary to the constitutional validity of the zoning resolution or ordinance that it permit the highest and best economic use of a particular piece of property. *County of Brevard v. Woodham,* 223 So.2d 344 (Fla. 4th D.C.A. 1969). As noted by the Florida Supreme Court in *City of St. Petersburg v. Aikin,* supra, 217 So.2d 315, the mere fact that a landowner is proposing to make both a reasonable use of his property and one consistent with the public welfare does not *per se* permit the conclusion that the zoning which precludes his proposed use is constitutionally defective. Zoning must be based on public rather than private use. It must be in the best interests of the community as a whole. *City of Tampa v. Consolidated Box Company,* 110 So.2d 446 (Fla. 2d D.C.A. 1959).

Most recently, the Third District Court of Appeal has reaffirmed the application of the fairly debatable rule to Dade County zoning decisions. In *Dade County v. Yumbo, S.A.,* 348 So.2d 392 (Fla. 3rd D.C.A. 1977), the District Court held —

Subsequent to Baker v. Metropolitan Dade County, supra, this court and the Supreme Court of Florida (in dealing with zoning cases involving Dade County ) have consistently applied the fairly debatable rule in those situations involving requests for rezoning, change of zoning boundary, or any other zoning act universally known primarily as an administrative action. Miles v. Dade County Board of County Commissioners, 260 So.2d 553 (Fla. 3d D.C.A. 1972); Metropolitan Dade County v. Crowe, 296 So.2d 532 (Fla. 3d D.C.A. 1974); Metropolitan Dade County v. Fletcher, 311 So.2d 738 (Fla. 3rd D.C.A. 1975); Marca, S.A. v. Dade County, 332 So.2d 142 (Fla. 3rd D.C.A. 1976). See also: Renard v. Dade County, 261 So.2d 832 (Fla. 1972).

Therefore, we find that the trial court erred in holding that the fairly debatable rule had been replaced by the substantial competent evidence rule in zoning cases of this nature, and we hereby hold that in those cases involving Dade County zoning actions, which are universally considered administrative in nature, the trial court shall employ the fairly debatable rule in reviewing the county's action.

The court hereby applies the applicable law as follows —

## III. CONCLUSIONS OF LAW

1. The question to be determined is whether the county commission's denial of petitioners' application based on the record adduced, constitutes a departure from the essential requirements of law. The court concludes that petitioners have sustained their extraordinary burden of proof by conclusively demonstrating that Resolution Z-34-76 is clearly arbitrary and capricious and is without substantial relationship to the promotion of the public health, safety, morals or general welfare of the community. In reaching this conclusion, the court has indulged every possible presumption in support of the commission's action and has exhaustively reviewed the record for competent, substantial evidence to sustain the commission's action as a matter of fair debate,[6] but, as noted in *City of Miami Beach v. Lachman*, 71 So.2d 148 (Fla. 1953) —

> There is no warrant whatever in this, or any other case to support the thesis that zoning boards are infallible and that any kind of a zoning proposition they promulgate will be upheld. In other words, zoning boards are in the same category as all other administrative boards. Their ordinances and regulations will be given serious consideration and their judgments great weight, but where it is conclusively shown that they deprive one of his property without due process or otherwise infringe on State or Federal constitutional guarantees unreasonably, such ordinances and regulations cannot be said to be reasonably debatable and will be stricken down. (71 So.2d at 150.)

2. The county commission has, under the guise of the police power, imposed restrictions that are clearly arbitrary and unreasonable as applied to petitioners' property. The actions of the commission controverted herein exceed the bounds of necessity for the public welfare and cannot be characterized as fairly debatable. The basis for denial of petitioners' application, as reflected in the county commission's zoning resolution, is that the Fisher Island application is in conflict with the principles and intent of the Comprehensive Development Master Plan for Metropolitan Dade County. However, all the expert testimony before the county commission was that the Comprehensive Development Master Plan of the county would neither be jeopardized nor materially affected by the granting of the petitioners' application. *City of Miami Beach v. First Trust Co.*, 45 So. 2d 681 (Fla. 1949); *Davis v. Sails*,

---

6. The court finds that the objections and concerns raised to the granting of petitioners' application do not, in a manner that makes sense or points to a logical conclusion, constitute competent, substantial evidence of sufficient degree to establish fair debate, and, in fact, are contradicted by the record by the county's own experts. *Hall v. Korth*, 244 So.2d 766 (Fla. 3rd D.C.A. 1971).

318 So.2d 214 (Fla. 1st D.C.A. 1975). All the expert testimony was that the Fisher Island application was in conformity with the goals, policies, standards and procedures of the Comprehensive Development Master Plan, with the exception of the 1985 and year 2000 Development Pattern Maps. These maps (on which Fisher Island was initially designated for parks and recreation use) did not comport to be the total embodiment of the Comprehensive Development Master Plan, and to the contrary, specifically provided that —

> THE METROPOLITAN DEVELOPMENT PATTERN MAP IS GENERALIZED AND NOT A ZONING MAP — Land uses shown on this pattern are GENERALIZED and present only the intensity and predominant type of urban activity proposed for the immediate area. THIS PATTERN IS NOT A PROPOSED ZONING MAP and is not intended to be used for the purpose of changing zoning *without an additional detailed planning study* of the immediate area in question.

> THE METROPOLITAN DEVELOPMENT PATTERN MAP IS ONLY ONE ELEMENT OF THE PLAN — The Development Pattern should be used and interpreted only in conjunction with the guidelines of the Metropolitan Development Guide. Both their guidelines and Development Pattern are inter-dependent elements of the Metropolitan Development Guide (Part III of the Comprehensive Development Master Plan). (Emphasis added.)

The text material referred to as part of the Metropolitan Development Pattern Maps, which was also adopted as Part III of the Comprehensive Development Master Plan, defined and identified the parks and recreation designation as follows —

> "The plan map illustrates only *existing and committed parks and recreation areas* of metropolitan significance including the Biscayne National Monument and the Everglades National Park." (Metropolitan Development Guide, Part II, Comprehensive Development Master Plan, page 200.) (Emphasis added.)

As part of its testimony to the county commission at the Master Plan amendment proceedings, the planning department advised that Fisher Island was originally designated for parks and recreation use on the Development Pattern Maps solely because of a policy, adopted prior to the passage of the CDMP, encouraging the state of Florida to acquire the island for public purposes. Once it was determined that funds for Fisher Island neither existed nor were committed, it recommended that the island be designated "medium-density use (up to 11.0 dwelling units per gross residential acre)" on the Development Pattern Maps, consistent with all the other policies and objectives of the Comprehensive Development Master Plan. The planning advisory board joined in this recommendation.

Without any basis that is apparent in the record, other than its announced desire to preserve Fisher Island for park purposes, the commission rejected the recommendations of the planning department and the planning advisory board and retained the park and recreation designation for Fisher Island on the Development Pattern Maps. It was only upon the explicit warning of the county attorney that such designation could not be sustained as a matter of law that the county commission considered an alternative designaion for Fisher Island on the 1985 and year 2000 Development Pattern Maps. Without any further staff study or other evidence, the commission designated Fisher Island "light green," the lowest possible residential density (up to 1.5 dwelling units per gross residential acre) shown on the Development Pattern Maps. According to the Metropolitan Development Guide (adopted as part of the Comprehensive Development Master Plan), such a designation is required when it is necessary to preserve the natural environmental characteristics of the area. However, the record in the cause is replete with the undisputed testimony and recommendations of all the county's experts that Fisher Island, being a spoil bank, possesses none of the natural environmetal characteristics which require preservation and protection.

This court is, therefore, constrained to agree with petitioners that the lack of forethought, study and consideration given to the proper land use designation for Fisher Island, as part of the Plan amendment process, particularly when coupled with the then ongoing activities of the commission to acquire Fisher Island for park purposes, substantially weakens the well-known presumption of validity which ordinarily attaches to such legislative action.[7] *Udell v. Hass*, 21 N.Y. 2d 463, 288 N.Y.S.2d 888 (1968), ("The difficulties involved in developing rational schemes of land use controls become insuperable when zoning or changes in zoning are followed rather than preceded by study and consideration") (Id. at 471 and 895); *Forestview Homeowners Ass'n, Inc. v. County of Cook*, 18 Ill. App. 3d 230, 309 N.E. 2d 763 (". . . we are constrained to agree that the failure of Cook County to plan comprehensively for the use and development of land in its unincorporated areas, and its failure to relate its rezoning decisions to data files and plans of other related county agencies, weaken the presumption of validity which would otherwise attach to a county ordinance.") (Id. at 240,

---

7. Because of the court's ruling in the cause, it does not reach the issue raised by petitioners that the county is equitably estopped to resist a higher classification because of its publicly announced intention to acquire Fisher Island for uses beyond the present zoning (GU- interim use) during the zoning process. See *City of Miami v. Silver*, 257 So.2d 563 (Fla. 3d D.C.A. 1972).

241, 243, 771, 773.) *Grant v. Washington Twp.*, 1 Ohio App. 2d 84 203 N.E.2d 859 ("While the burden of proof was on the plaintiff-appellee the failure of appellant's evidence to establish any substantial underlying basis for the 'plan' of the township's development has considerable bearing in determining the manifest weight of the evidence.") (Id. at 87, 861-862.) *Barone v. Township of Bridgewater*, 45 N.J. 224, 212 A.2d 129 (1965) ("This is all well, but it is elementary that every district use classification is not saved simply because it is part of a comprehensive community plan. The plan to be a valid and effective influence in support of zoning regulations must not be a capricious one and its existence will generally not ipso facto isolate from scrutiny or invalidity the use classification of a substantial area which is established to be realistically unreasonable.") (212 A.2d at 130.) As previously noted in *State ex rel. Henry v. City of Miami*, supra, 158 So.2d 82, 84, land use regulation enacted simply as a piece of guesswork, with no attempt to study the county's problems and no effort to accomplish some general plan adapted to the county's needs in the way of health, safety, welfare and the like, is generally unsustainable as a reasonable or valid police regulation. See also, *Boca Villas Corp. v. City of Boca Raton*, 45 Fla. Supp. 65 (1976). Therefore, the court finds without merit the county's argument that fair debate is established because the county staff had recommended denial of the application because of its divergence from the Development Pattern Maps.[8] Compare, *Hall v. Korth*, 244 So.2d 266 (Fla. 3rd D.C.A. 1971); *Metropolitan Dade County v. Fletcher*, 311 So.2d 738 (Fla. 3rd D.C.A. 1975), cert. den., 327 So.2d 32.

3. It is not the function of a court to rezone property (see *Metropolitan Dade County v. McGeary*, 291 So.2d 28 and cases cited therein at page 29) but, the facts and circumstances of this cause considered, it is the court's function to determine at what point future zoning regulations would likewise become arbitrary and invalid, *Burritt v. Harris*, supra, 172 So.2d 820. On the merits of the controversy, the record here conclusively establishes that the zoning of the land under consideration is palpably arbitrary and unreasonable and has no reasonably debatable relation to the public health, safety or general welfare, and that it should be rezoned. It is the opinion of the court that the evidence, which includes matters voluntarily proferred of record, conclusively shows that any zoning restriction on petitioners' property which is more restrictive than medium density — up to an overall density of 11.0 dwelling units

---

8. Other than on the issue of conformity, the county staff recommended that the application had adequately provided for the majority of the public facilities and services for the Fisher Island community with little impact on existing systems.

per gross residential acre — would exceed the bounds of public necessity and likewise be an invasion of fundamental constitutional rights.

It is therefore ordered and adjudged —

1. That the petition for writ of certiorari be and the same is hereby granted.

2. That Dade County's Zoning Resolution No. Z-324-76 be and the same is hereby quashed as being invalid and unconstitutional.

3. That the cause is remanded in its entirety to the board of county commissioners for further action not inconsistent with this opinion. The county shall promptly reconsider petitioners' application and within 60 days of this judgment shall file in this cause a report showing compliance herewith.

4. That the court retains jurisdiction for the purpose of enforcing this judgment and for hearing a petition for costs.